CAMERON K. WEHRINGER, Appellant, v HARRY NEWMAN et al., Respondents.

First Department, January 5, 1978

---

### APPEARANCES OF COUNSEL

*Cameron K. Wehringer, pro se,* of counsel *(Wehringer & Kojima,* attorneys), for appellant.

*Mark L. Rosen* of counsel *(Sabin, Bermant & Blau,* attorneys), for respondents.

### OPINION OF THE COURT

LUPIANO, J. P.

This libel action is based on an article which appeared in the January 5, 1976 edition of *Real Estate Weekly,* a newspaper published by Hagedorn Publishing Co. Defendants Harry N. Newman and Edwin Ostrow are attorneys who wrote the article as part of their regular weekly column, "Getting Down

to Cases." Plaintiff, also an attorney, appears *pro se.* He was a litigant in a case before this court, *Wehringer v Gibbons-Hollyday & Ives* (49 AD2d 109). The article referred to this court's decision in that case as reported in the New York Law Journal of October 15, 1975. In essence the article criticized the practice whereby a proprietary tenant in a co-operative apartment house who feels he has a claim against the co-operative refuses to pay his share of the carrying charges of the building until the suit is determined. Plaintiff prepared a reply to the defendants' article, entitled "Reply to the Plethora of Hate" dated February 21, 1976, which he sent to defendants for publication in the *Real Estate Weekly.* Defendants published the "Reply" in the May 13, 1976 edition.

Defendants moved for summary judgment, contending that the article was constitutionally privileged and constituted fair comment. Special Term held that even if the article could be construed as having a defamatory meaning, it deals with a matter of public interest and is legally protected by a qualified privilege. It was concluded that the burden was on plaintiff to establish that the publication was made with actual malice and that he failed to demonstrate that there were facts sufficient to permit a jury to find that the defendants acted with malice. We would affirm.

Chief Judge CARDOZO aptly noted in *Ostrowe v Lee* (256 NY 36, 38): "In the law of defamation, publication is a term of art. * * * A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however, as soon as read by any one else."

"Absent a communication to some third person, no damage, either actual or presumed, can result. In short, until the publication, the act is not complete in its mischief. * * * Similarly, to constitute actionable slander, the slanderous words must have been spoken in the presence and hearing of some person other than the one slandered. The factor that renders the making of a slanderous statement actionable is its publication" (34 NY Jur, Libel and Slander, § 59).

In 1964, the United States Supreme Court in *New York Times Co. v Sullivan* (376 US 254) held that the fair comment privilege for reports concerning *public officials* was mandated by the First Amendment which guarantees freedom of speech and freedom of the press. Thus, a public official who was the subject of a defamatory statement relating to his official conduct could recover for libel only by proving actual malice

on the part of the publisher.[1] Since that time the courts, both Federal and State, have struggled with the problem of reconciling the competing interests of a free press and the right of an individual to the protection of his own good name and to privacy in setting forth the perimeters of actionable defamation.[2] To the "public official" group of persons embraced by the *New York Times* decision was subsequently added "public figures"—those who while not "public officials," nevertheless by virtue of their status or by being thrust "into the 'vortex' of an important public controversy, [command] sufficient continuing public interest and * * * sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements" *(Curtis Pub. Co. v Butts,* 388 US 130, 155). Advocation of the primacy of a free press in conflict with, *inter alia,* society's interest in preventing and redressing attacks upon reputation and the right to privacy reached its zenith in limiting actionable defamation in *Rosenbloom v Metromedia* (403 US 29). In that case, regardless of whether the plaintiff was a *public* or *private* figure, the privilege enunciated in the *New York Times* case was extended to all areas of public concern. The degree of protection afforded an individual by the law of libel was determined not by the status of the individual, but by the public or general importance of the matter set forth in the publication. "If a matter is a subject of public or general interest, it cannot become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety" (p 43).

■ Subsequently in 1974 the Supreme Court reassessed the primacy given to the public importance of the subject matter

1. Actual malice included either knowledge that the publication was false or a reckless disregard of its truth or falsity *(New York Times Co. v Sullivan,* 376 US 254, 279-280).

2. The individual's right to the protection of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system" *(Rosenblatt v Baer,* 383 US 75, 92 [concurring opn]).

of the publication in defining the scope of protection afforded by the law of libel to an individual plaintiff. In *Gertz v Robert Welch, Inc.* (418 US 323), the court focused upon the status of the plaintiff claiming defamation, i.e., whether he was a "public" or "private" figure.[3] Essentially the *Gertz* court while adhering to the *New York Times* standard in respect of public officials and public figures,[4] permitted the States to define their own perimeters of liability for defamation of a private individual, so long as strict liability did not apply. Further, it limited recovery to compensation for actual injury, at least when liability was not based on a showing of actual malice. Close analysis of the *Gertz* decision impels the conclusion that the Supreme Court intended reasonable restriction of the public figure category.[5] Accordingly, under *Gertz* a private plaintiff involved in a matter of public interest need not prove actual malice in order to recover for defamatory statements, but could recover *on a showing of fault* with compensation limited to actual injury, at least when liability was not based on actual malice.

Following the lead enunciated in *Gertz* whereby the States were free to define their own standards of liability for defamation of a *private* individual, the New York Court of Appeals in *Chapadeau v Utica Observer* (38 NY2d 196, 199) declared: "We now hold that within the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably re-

---

3. Mr. Justice POWELL in delivering the opinion of the court observed: "This Court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment" (418 US 323, 325). "The principal issue in this case is whether a newspaper or broadcaster that publishes defamatory falsehoods *about an individual who is neither a public official nor a public figure* may claim a constitutional privilege against liability for the injury inflicted by those statements" (418 US 323, 332) (emphasis supplied).

4. The "public figure" test first formulated in *Curtis Pub. Co. v Butts* (388 US 130) was reaffirmed (418 US 323, 345). "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. * * * Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation" (418 US 323, 345, 352).

5. See, also, *Time, Inc. v Firestone*, 424 US 448.

lated to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted *in a grossly irresponsible manner* without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (emphasis supplied).

■ ■ On the record herein we conclude that the article complained of is within the sphere of legitimate public concern. It dealt with a judicial proceeding involving a real estate problem in a newspaper which publishes articles of interest to the real estate community. With respect to the fact that the article contains both representations of fact and opinion by the authors, it is noted that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advance society's interest in 'uninhibited, robust, and wide-open' debate on public issues" *(Gertz v Robert Welch, Inc., supra,* pp 339-340). As noted in *Rinaldi v Holt, Rinehart & Winston* (42 NY2d 369, 380): "Opinions, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions, provided that the facts supporting the opinions are set forth. *(Buckley v Littell,* 539 F2d 882, 893, cert den 429 US 1062; Restatement, Torts 2d, § 566.)"

■ The context of the article complained of reveals an expression of simple or pure opinion by the authors, defendants herein, whereby they assert personal comment on certain facts which they state. As to such type of expression of opinion the privilege of fair comment applies (see *Gertz v Robert Welch, Inc., supra;* Restatement, Torts 2d, § 566). In *Chapadeau,* the Court of Appeals was concerned with libel based upon misstatement of facts. "In order to be deemed privileged, comment on a matter of public interest must be fair, the facts truly stated, and an honest expression of the writer's real opinion or belief" (35 NY Jur, Libel and Slander, § 127). As to the facts alleged in the article, defendants in moving for summary judgment respectively declared that the writing "was a reliable account of events" and that in publishing the article there was "no reason to believe that it was not

a reliable account of events." Plaintiff, in opposing the motion, did not controvert this assertion, but complained that the article was not a "fair and true report" in that it did not present a more detailed representation of facts regarding our opinion in *Wehringer v Gibbons-Hollyday & Ives.* Respecting the factual representations in the article complained of and applying the rule delineated in *Chapadeau,* it must be concluded that the factual representations, although brief, are not claimed to be false and that plaintiff has failed to carry his burden of demonstrating that the defendants, publishers, "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties."[6] Undoubtedly plaintiff's objections are based upon the opinion tenor of the article wherein defendants express great dissatisfaction with proprietary tenants in a co-operative building who refuse to pay the carrying charges of the building when and while they assert damage claims against the co-operative. We note that the expression of opinion delineated in the article does not give rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendants. Clearly, the opinion being uttered by defendants as to plaintiff's conduct was in the context of a statement of facts upon which the opinion was based. This was a pure type of opinion expressed on a matter of public concern within the ambit of the "fair comment" privilege. Since we are not concerned here with private communications on private matters, it suffices to state that the common-law rule which views an expression of pure opinion involving a public communication on a matter of public concern as the basis of an action for defamation may well be interdicted by constitutional considerations (see *Gertz v Robert Welch, Inc.,* 418 US 323, 339, *supra;* Restatement, Torts 2d, § 566, Comment *c*). We do not reach this issue, however, because, assuming the continued viability of the common-law rule that an expression of simple or pure opinion may be the basis of an action for defamation, plaintiff has failed to demonstrate the existence of a factual issue as to

**6.** In *Wehringer v Gibbons-Hollyday & Ives* (49 AD2d 109, 110) we stated: "Plaintiff-respondent, a shareholder and tenant in a co-operative apartment house * * * commenced an action * * * against * * * the owner, and * * * the managing agent of the building, to recover for water damages to his apartment. * * * Following the commencement of the action, plaintiff ceased to pay the maintenance charges, or rent, for his co-operative".

actual malice on the part of defendants.[7] In *Hoeppner v Dunkirk Print. Co.* (254 NY 95, 106) the Court of Appeals declared: "No comment or criticism, otherwise libelous, is fair or just comment on a matter of public interest if it be made through actual ill will and malice. * * * By actual malice is meant *'personal spite or ill will,* or culpable recklessness or negligence' ". (emphasis supplied).

Accordingly, the order of the Supreme Court, New York County (FEIN, J.), entered July 18, 1977, which granted summary judgment to defendants and dismissed the complaint should be affirmed, with costs and disbursements.

BIRNS, SILVERMAN and EVANS, JJ., concur.

Order, Supreme Court, New York County, entered on July 18, 1977, unanimously affirmed. Respondents shall recover of appellant $60 costs and disbursements of this appeal.

---

7. The assumption of the continued viability of the common-law rule is here maintained for pragmatic reasons. "In the application of pertinent legal reasoning and principles to individual factual circumstances in this area of the law where a state of flux patently prevails, the court must be mindful of needless extension of a 'rule'. The expansion of one right tolls the confinement of another in the delicate balancing of private as compared or contrasted with public issues and/or persons" *(Bavarian Motor Works v Manchester,* 61 Misc 2d 309, 311).