MAYNARD R. COTTOM, JR., Appellant, v MEREDITH CORPORA-
TION et al., Respondents.

Fourth Department, December 8, 1978

APPEARANCES OF COUNSEL

*Michael Lo Pinto (Raymond M. Schlather* of counsel), for appellant.

*Bond, Schoeneck & King (S. Paul Battaglia* of counsel), for respondents.

## OPINION OF THE COURT

SIMONS, J.

Plaintiff seeks damages from defendants, the owner and operator of a commercial television station and its reporter, alleging that they defamed him in reporting the details of a private dispute between him and his tenant. Special Term granted defendants' motion for summary judgment, holding that the subject matter of their television broadcast was "arguably within the sphere of legitimate public concern" and, therefore, they were not answerable to plaintiff absent proof, not appearing here, that they acted "in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199).

Plaintiff is a farmer and a part-time self-employed carpenter residing in Summerhill, New York. In June, 1970 he purchased the farm adjacent to his and owned by Richard and Helen Wrisley. Because the Wrisleys were elderly and had no place to go, it was agreed in writing that they could continue to live in the farm house for the rest of their lives, they to be responsible for certain costs of maintenance and utilities and plaintiff to be responsible for "structural repairs and replacements to see that the living quarters are at least as adequate for [Wrisleys] as they were in June, 1970."

The Wrisleys have had difficulty in heating the house, a circumstance which has produced several disputes with plaintiff. At one point the situation became so aggravated that Mr. Wrisley threatened plaintiff with a loaded gun and the State Police were called. It does not appear how defendants became aware of the situation but in January, 1976 they prepared and broadcast a news story entitled "People are Freezing in Summerhill". Plaintiff's action followed that broadcast.

To prepare the story, defendant reporter, Jay Newman, went to the Wrisleys' home in January and filmed an interview with them. The film depicted the house in a state of

disrepair and Mrs. Wrisley stoking coal and wood in the furnace and stove. Reporter Newman opened the interview with these remarks: "At one time, this was probably a fine wooden home in the country. But that was a long time ago. And since then, the wood has begun to crumble * * * the roof to leak. Yet, despite the troubles * * * Richard and Helen Wrisley continue to live here. Three years ago, they thought their troubles were over. The Wrisleys sold the house and farm land to a neighbor. And they claim the neighbor in return for a good price, agreed to let them live in the house * * * and they claim the neighbor was to maintain the structure. That hasn't happened." Newman then asked Wrisleys why they did not move. Mr. Wrisley answered: "Well, I hate to move. I'm crippled up. I can't use my feet. I have to hire all the work. I'm comfortable here if it was heated, and like that. I have lived here for quite a few years and I'd like to stay here the rest of my remaining years." Newman asked how bad conditions got. Mrs. Wrisley answered: "Well, it gets down to maybe 40 degrees and down the cellar, it's below freezing even with a heater on. It's very cold. I'm so cold I have to keep changing my shoes to slippers and I get pretty cold, that's all. Our floors are especially cold."

As the interview continued, two county social workers arrived and were questioned. Their advice was to "get after the landlord". To substantiate their grievance, the Wrisleys then showed Newman the lease clause quoted above which obligated the landlord to make certain repairs.

After concluding the interview, Newman went to plaintiff's house and invited him to be interviewed on film but plaintiff declined the offer. He did state, however, that he had lived up to his part of the bargain and his claim was reported as a part of the television broadcast. After returning to the studio, Newman checked his notes, consulted with the County Commissioner of Social Services and broadcast the story, concluding it with the statement: "We did talk with the neighbor who owns the Wrisley house. Maynard Cottom did not want to do a filmed interview. But he did say he's lived up to his end of the bargain, done the work he's required to do."

Plaintiff's complaint alleges that he was defamed by the broadcast and specifically by the words "that hasn't happened". Defendants have asserted several defenses but primarily they contend that the statement is not defamatory, that read in context it is obviously a contraction, i.e., "[Wrisleys

claim] that hasn't happened." They claim further, however, that if it is defamatory, plaintiff has not met his burden of proving that the defendants acted in a grossly irresponsible manner.\* We seriously doubt that the statement is defamatory (see *James v Gannett Co.,* 40 NY2d 415, 420), but even if it is, we find that plaintiff has failed in his burden of proof and we therefore affirm.

■ Legal analysis begins with *New York Times Co. v Sullivan* (376 US 254). In that case the Supreme Court held that the First Amendment guarantees of free speech and press do not permit a public official allegedly defamed in regard to his conduct, fitness or role as a public officer to maintain an action for defamation unless he proves that the defendant published the communication "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not" (p 280). This rule was later extended to defamation actions by public figures *(Curtis Pub. Co. v Butts,* 388 US 130; see, also, *James v Gannett Co., supra),* and to publications involving private individuals but concerning matters of public or general interest *(Rosenbloom v Metromedia, Inc.,* 403 US 29, 43-44). New York cases interpreting the *Rosenbloom* rule imposed this burden of proof on private plaintiffs seeking to recover for defamatory statements concerning matters that were "newsworthy" *(Trails West v Wolff,* 32 NY2d 207, 215-216). The expressed rationale of these decisions is that free government depends upon open and uninhibited discussion. That being so, it was held more important in the inevitable trade-offs which must be made in accommodating the competing values of the public's right to know and the individual's right to be free from false accusations that no undue burden of investigation or confirmation be placed upon news agencies in reporting matters of public or general interest.

Subsequently, in *Gertz v Robert Welch, Inc.* (418 US 323), the Supreme Court retreated from the broad *Rosenbloom* rule. Although holding that in certain cases there could be no liability for defamation without fault, it delegated to the States the responsibility for fashioning appropriate rules in cases involving publishers charged with defaming private

---

\* It is convenient to refer to a publication as constitutionally privileged, which in a sense it is, but the question really relates to the burden of proof required to establish the defamation when constitutional principles are applied in libel actions (see Restatement, Torts 2d, § 580A, Comment *e;* § 580B, Comment *j).*

individuals. In *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199, *supra)*, the Court of Appeals responded to the *Gertz* decision and formulated the following rule: "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." It is that standard which is to be applied in this action.

■ If it be determined that the matter contained in this broadcast was "arguably within the sphere of legitimate public concern," plaintiff must fail on this motion because the evidence in the record is not sufficient to raise a factual issue of irresponsibility on the part of defendants (cf. *Goldman v New York Post Corp.,* 58 AD2d 769; *Commercial Programming Unlimited v Columbia Broadcasting Systems,* 50 AD2d 351; and cf. *Lake Havasu Estates v Readers Digest Assn.,* 441 F Supp 489, 492).

The courts have not articulated the criteria by which to test what matters are of legitimate public concern. Examples are helpful, however. In applying the broader *Rosenbloom* rule, the New York courts have held to be privileged reports of such matters as bus safety *(Trails West v Wolff,* 32 NY2d 207, *supra);* the quality of food in a public restaurant *(Twenty-Five East 40th St. Rest. Corp. v Forbes, Inc.,* 30 NY2d 595); and the arrest of a private citizen *(Kent v City of Buffalo,* 29 NY2d 818). In a case decided prior to *Rosenbloom* but applying the *New York Times* rule, the publisher of basketball scouting reports for private clients was foreclosed from recovering for defamation, the court holding that the constitutional privilege should be applied (see *Garfinkel v Twenty-First Century Pub. Co.,* 30 AD2d 787, 788) and in *Chapadeau* the court considered a news report of a public school teacher's arrest for drug offenses, part of which was allegedly false. Other New York decisions subsequent to *Gertz* are *Goldman v New York Post Corp.* (58 AD2d 769, 770 [involving "massage parlors" and applying *Chapadeau])* and *Safarets, Inc. v Gannett Co.* (80 Misc 2d 109, affd 49 AD2d 666 [involving the alleged inhumane treatment of animals in a pet store but decided prior to *Chapadeau]).* Also helpful are the Supreme Court's decisions

in *Time, Inc. v Firestone* (424 US 448), which refused to extend the *Gertz* rule to reports of a socialite's divorce proceedings, and *Matus v Triangle Pub.* (445 Pa 384, and see cases cited therein at pp 396-398), which held that constitutional privilege did not protect a radio reporter's broadcast that his wife had been overcharged by a snow plow operator.

The decisions necessarily have been made *ad hoc* and they are not entirely consistent. Nevertheless they help locate the limits of the general area within which the courts' discretionary powers must be exercised. Thus, in the language of *Chapadeau,* a matter is not just "arguably" "of legitimate public concern" but is clearly so if it involves the public business, for the rule requiring proof of fault in defamation actions rests upon the premise that the public needs to know those things which enable government to operate successfully. Conversely, a publication is not a matter of public concern if it involves only gossip or if it involves an issue directed to a limited audience (see *Time, Inc. v Firestone, supra;* Restatement, Torts 2d, § 580B, Comment *f).* Within these extremes may be found matters "warranting public exposition" *(Chapadeau v Utica Observer-Dispatch, supra)* of greater or lesser degree and it is this area in which the courts must exercise their supervisory duty and balance the conflicting interests of the public generally and the private individual.

In this action plaintiff contends that defendants' broadcast involved a private legal dispute between a landlord and his tenants, not an investigative report of living conditions generally, nor even a public problem involving these tenants. Defendants, on the other hand, contend that this was a story about an issue of legitimate public concern; the health and welfare of elderly citizens living on fixed incomes. An editor's characterization or entitlement of a story, by itself, does not determine the public's interest or concern, of course, and we recognize that news stories can be "made" and (for legitimate and desirable purposes) "public concern" can be generated. If we were to test the publication by its newsworthiness, application of the constitutional privilege would rest solely in the editor's hands. Nevertheless, a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is "newsorthy", may be powerful evidence of the hold those subjects have on the public's attention.

Indisputably, the health and safety of elderly people are within the sphere of legitimate public concern. They are

matters involving a substantial segment of the population, and have been the subject of extensive governmental attention. This incident told the story of one isolated family, but it was a story symptomatic of the larger problem. The Wrisleys were living in substandard conditions for persons of any age and government social agencies had been called to investigate. Their dispute with plaintiff had required police intervention in the past and provided some danger to public safety. Although the broadcast incidentally referred to a private legal dispute between plaintiff and his tenants (and may have been inaccurate in this respect), that fact did not affect defendants' constitutional privilege inasmuch as the story as a whole was a matter of legitimate public concern.

The order should be affirmed.

MOULE, J. P., CARDAMONE, HANCOCK, JR., and WITMER, JJ., concur.

Order unanimously affirmed, without costs.