Dorothy **FITZPATRICK**, a/k/a Debbi Fitzpatrick, in her own right and as parent and natural guardian of Marijo Calvanese, a minor; F. Emmett Fitzpatrick, Jr.; Carmen Calvanese; Paula Joan Fitzpatrick; F. Emmet Fitzpatrick, III; James Michael Fitzpatrick; and Peter John Fitzpatrick

v.

**MILKY WAY PRODUCTIONS, INC.**

Civ. A. No. 79–2335.

United States District Court, E. D. Pennsylvania.

March 22, 1982.

James E. Beasley, Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for plaintiffs.

Paul R. Rosen, Spector, Cohen, Gadon & Rosen, Philadelphia, Pa., for defendant.

MEMORANDUM *

LOUIS H. POLLAK, District Judge.

Plaintiffs, Dorothy Fitzpatrick, her husband F. Emmett Fitzpatrick, Jr., and their children, are citizens of Pennsylvania. Their diversity complaint alleges, in separate counts, causes of action for defamation, invasion of privacy, and intentional infliction of emotional distress. In anticipation of defendant's motion for summary judgment, the parties have requested, and this memorandum is limited to, a determination on the choice of law to govern the issue of liability on plaintiffs' cause of action for defamation.

The events which prompted this law suit are not disputed:

Defendant Milky Way Productions, Inc. ("Milky Way"), a New York corporation, publishes a weekly newspaper of general circulation called *Screw*.[1] On July 12, Milky Way received a request for publication of the following classified advertisement:

> Gamble with Sex, Anything Goes, You're a Winner in Atlantic City. Have fabulous free fuck while vacationing. Kinky, sex-loving, exotic lady. Sensational, insatiable. Debbi, 908 Seacliff, Ocean City, N. J. Phone listed—Fitzpatrick.

The request, printed on an order form clipped from a previous *Screw* edition, carried the signature "Debbie P. Fitzpatrick," the address "908 Seacliff Road, Ocean City, N. J. 08226," and a telephone number. The form was accompanied by a money order made payable in an amount sufficient to cover the cost of publishing the advertisement for one week. The ad appeared in *Screw* issue number 491, bearing the date July 31, 1978. Although the Fitzpatricks are domiciled in Pennsylvania,

on July 24, 1978, the day when issue 491 first reached newsstands in New York City, plaintiff Dorothy (a/k/a Debbi) Fitzpatrick was residing at plaintiffs' summer home in Ocean City, New Jersey.

The Fitzpatricks allege that the advertisement referred to, and was intended to lead the public to believe that it had been placed by, Debbi Fitzpatrick.[2] With respect to their claim for defamation, plaintiffs allege that the advertisement contained false statements of fact which were not privileged and did not amount to fair comment on matters of public concern or interest, "which statements constitute a libel and defamation of plaintiffs and a libel *per se* of plaintiffs by imputing to plaintiff wife criminal and immoral conduct." Complaint at 3. The Fitzpatricks seek to recover compensatory and punitive damages.

I

A plausible claim can be advanced for applying the libel law of either of two states: (1) Pennsylvania—the place of plaintiffs' permanent residence and therefore, plaintiffs allege, the place where they have suffered the greatest injury to reputation; and (2) New York—the situs of Milky Way's incorporation and principal place of business and also headquarters for the publication of *Screw*. Plaintiffs contend for the application of Pennsylvania's libel law; defendant argues for applying New York law.[3]

While they disagree about which state's defamation law should govern, the parties share a common view of what standards of care Pennsylvania and New York respectively impose on publishers in defamation cases such as this one: According to the parties, should Pennsylvania law be found to govern plaintiffs' defamation claim, then

---

* This memorandum explicates the basis for an order of the court entered on December 30, 1981.

1. Other Milky Way publications are: *Screw West; Best of Screw;* and *Sex Sense.*

2. On deposition, Mrs. Fitzpatrick testified that she first became aware of the ad on the morning of July 24, 1978, after receiving a series of telephone calls at her home in New Jersey from anonymous men responding to the advertised offer. *Plaintiffs' Deposition at 19–21.*

3. Neither side advances a claim for the application of New Jersey's libel law. Such a claim would not warrant serious consideration based on this record. See note 17, *infra.*

plaintiffs will merely be required to show negligence on Milky Way's part with respect to Milky Way's attempts, or non-attempts, to determine the source and reliability of the allegedly defamatory advertisement; if, however, New York law applies, it is the opinion of the parties that plaintiffs will have to meet the more stringent requirement of showing gross irresponsibility on the part of Milky Way.

My own examination of the defamation law of the two states persuades me that the parties are probably right about Pennsylvania law but almost certainly wrong about New York law, the error on the latter score deriving from extended reliance on a quite inapposite New York case.

In the following portion of this Memorandum, I consider the recent case law of defamation in Pennsylvania and in New York, and from that case law I distill certain conclusions as to the applicable standards of care in the two states. I have undertaken to examine these two bodies of case law, independently of the concurrent analysis advanced by the parties, for two reasons: A correct determination of the standard of care applicable in each state is essential (1) to decide whether, in fact, a conflict of laws exists, and (2) in the event such a conflict is found to exist, to weigh the competing state interests and policies for the purpose of deciding, as a matter of choice-of-law, which state's law of defamation should be applied to this controversy.

### A.

A brief excursion into First Amendment defamation doctrine is necessary to provide a backdrop against which we must consider the unsettled condition of Pennsylvania and New York defamation law and attempt to divine the standard of liability each of the two states would apply to Milky Way's actions and/or non-actions. The interplay of the common law of defamation and First Amendment doctrine has generated two pairs of categories which bear on the matter at hand.

The first pair of categories divides defamation plaintiffs into "public officials" and "public figures" on the one hand, and "private figures" on the other. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–5, 94 S.Ct. 2997, 3009–3010, 41 L.Ed.2d 789; *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). It is undisputed that, for the purposes of this law suit, plaintiffs are "private figures." [4]

The second pair of categories (one which the parties seem to have overlooked) is that which classifies defamatory falsehoods according to their subject-matter, distinguishing "matters of general or public concern" from matters falling "outside the area of public or general interest." *Rosenbloom v. Metromedia*, 403 U.S. 29, 44, 91 S.Ct. 1811, 1820, 29 L.Ed.2d 296 (1970) (Brennan, J., plurality opinion). This distinction has its origins in the common law of defamation's long-standing recognition of a privilege or defense of fair report and comment on matters of public interest.[5] The distinction took on constitutional garb in the plurality opinion in *Rosenbloom v. Metromedia, supra*, which concluded that the *New York Times Co. v. Sullivan*, 374 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard of knowing-or-reckless falsity applied in cases brought by "private" plaintiffs, as well as "public" plaintiffs, when the allegedly defamatory publication involved matters of "public or general concern." *Rosenbloom v. Metromedia, supra*, 403 U.S. at 52, 91 S.Ct.

---

**4.** As the Third Circuit recently observed, among the most important considerations distinguishing "public" from "private figure" plaintiffs is that the former, by "thrusting themselves" to the forefront of particular public controversies, voluntarily assume a greater risk of injury from defamatory falsehoods. *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264,

273 (3d Cir. 1980). Plaintiffs have plainly not thrust themselves into any public limelight or controversy that might entail "assuming the risk" of such defamation as is alleged here.

**5.** *See, e.g.*, Ernest P. Seedman, 1 *The Law of Libel and Slander in New York*, 282–333

at 1824.[6] In 1974, three years after *Rosenbloom* was decided, a majority of the Supreme Court retreated from the plurality's approach in that case. In *Gertz v. Robert Welch, Inc., supra*, the Court held that application of the *New York Times* standard of knowing-or-reckless falsity henceforth would be constitutionally mandated solely in cases dealing with plaintiffs who are "public officials" or "public figures." *Id.* 418 U.S. at 346, 94 S.Ct. at 3010.[7] The *Gertz* Court then proceeded to establish a new minimum constitutional standard of proof for defamation suits brought by private plaintiffs, irrespective of whether the allegedly defamatory statements involved matters of public or merely private concern. It held that in such cases, "so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster." *Id.* at 347, 94 S.Ct. at 3010. Until *Gertz* most, if not all, states applied a standard of strict liability in private plaintiff defamation cases involving publication of matters falling outside the area of public or general interest.[8] With *Gertz*, for the first time, a constitutional restraint—the proscription of strict liability—was imposed on the standard of proof to be applied by the states in such cases.

### 1. *Pennsylvania defamation law*

■ Historically, Pennsylvania courts have hewn to the traditional common law standard of strict liability in private plaintiffs' defamation cases. Regardless of the care exercised by the publisher, the law "presumes malice" upon plaintiff's showing of a false and defamatory publication. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899, 909 (1971). In appropriate cases, defendants are entitled to raise a privilege, either absolute or qualified, and the privilege, if proven, operates to "negate the presumption of malice." *Id.* at 909 and n. 10. Among the qualified privileges, one that is pertinent here is the privilege inhering in allegedly defamatory publications that involve a comment upon "matters of public concern." *Id.* at 907–908.[9] Until recently, when a defendant established this privilege plaintiff had the burden of proving, at a minimum, negligence or "want of reasonable care in ascertaining" the truth or falsity of the allegedly defamatory statements. *Id.* at 909; *Matus v. Triangle Publications, Inc.*, 445 Pa. 384, 286 A.2d 357, 361 (1971). But in 1971, the year following *Rosenbloom*, the Pennsylvania Supreme Court adopted "as binding," the *Rosenbloom* plurality's rule; hence the "matter of public concern" privilege was held to impose on a private plaintiff the burden of showing knowing-or-reckless falsity. *Matus v. Triangle Publications, Inc., supra*, (1971). However, when the allegedly defamatory publication does not involve a matter of public concern, and no other privilege applies, then, according to Pennsylvania law, strict liability prevails.

The Pennsylvania Supreme Court has yet to consider, in light of *Gertz*, what standard of liability now *governs* in Pennsylvania in suits brought by "private figure" plaintiffs.

(1964); Warren and Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193, 214 (1890).

**6.** The plurality opinion expressly left open "the question of what constitutional standard of proof, if any, controls the enforcement of state libel laws for defamatory falsehoods published or broadcasted by news media about a person's activities not within the area of public or general interest." *Id.* 403 U.S. at 44 n. 12, 91 S.Ct. at 1820, n. 12.

**7.** Underpinning this holding was the conclusion that the *Rosenbloom* plurality's extension of the *New York Times* test abridged to an unacceptable degree the legitimate state interest in retaining "substantial latitude in [its] efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Id.* 374 U.S. at 345–6, 84 S.Ct. at 3010. The Court also criticized the fact that the *Rosenbloom* approach forced "state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not." *Id.* at 346, 84 S.Ct. at 3010.

**8.** See *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 388–392, 94 S.Ct. at 3030–3032 (White, J., dissenting).

**9.** This privilege is codified at 42 Pa.C.S.A. § 8343(b)(3).

*Gertz* would seem to demand that strict liability in private plaintiff/private subject matter suits be abrogated. What is uncertain is whether the Pennsylvania Supreme Court would adopt any standard more stringent than common law negligence.

█ My reading of *Matus, supra,* persuades me that: (1) in light of *Gertz,* the Pennsylvania high court would hold a negligence standard appropriate in private plaintiff/private subject matter cases; and (2) the Court would regard the present matter as belonging in that class of cases. In *Matus,* as noted above, the court adopted the rule of the *Rosenbloom* plurality; however, the court held that the defamatory statements in the particular case before it did not relate to the "private figure" plaintiff's "involvement in an event of public or general concern," and that, therefore, the case did not demand application of the newly adopted knowing-or-reckless falsity standard. Plaintiff in *Matus* operated a one-man snow-plowing business. The defamatory statements were made by a radio talk-show host who said over the air that his wife had been overcharged by plaintiff and that "people like that shouldn't be in business." *Matus, supra,* 286 A.2d at 364–365. The court concluded that the statements were "no contribution 'to robust debate on public issues' ... but a matter of private pique." *Id.* at 365. Accordingly, the court held that the negligence or "want of reasonable care" standard applied by the *Matus* trial court in its jury charge was proper.[10] *Id.* To be sure, *Matus,* decided three years prior to *Gertz,* did not uphold the

negligence standard as constitutionally necessary, or constitutionally sufficient, in private plaintiff/private subject matter cases. However, the *Matus* court clearly signalled its conviction that the standard applied by the trial court below represented a proper—indeed, a generous—accommodation, in such cases, of the interests of news media on the one hand and private figure plaintiffs on the other.[11] Reconsideration of *Matus* in light of *Gertz* would presumably prompt recognition that strict liability is not a constitutionally permitted standard in private plaintiff/private subject matter cases, but there seems no reason why *Gertz* would lead the Pennsylvania Supreme Court to revise its conclusion that the "reasonable care" standard adequately protects the interests of defendants in such cases.[12] Finally, in light of *Matus'* stringent demarcation of what constitutes a "matter of Public concern" in the context of classifying the facts in *Matus* itself, it seems clear that the Pennsylvania Supreme Court would determine that the Fitzpatricks' suit against Milky Way does not involve a "matter of public concern."

### 2. *New York defamation law*

Unlike Pennsylvania's high court, the New York Court of Appeals has decided several private plaintiff defamation cases in the wake of *Gertz.* The leading case is *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975). There, the court, released from "the compulsion of *Rosenbloom,*" did not

---

**10.** The trial court had applied the "reasonable care" standard because defendant had raised, and plaintiff had not disputed, a conditional privilege by dint of defendant's "conducting a program of discussion and comment about local matters." *Id.* at 361.

**11.** "The great values of the First Amendment are not served by making it a haven for unprovoked gossip-mongering of interest only to the speaker ... The breathing space which the Amendment requires in terms of modification of traditional libel laws will not be restricted by the normal application of the law of Pennsylvania in this case." *Id.* at 365.

**12.** A closer question would be presented were it necessary for me to predict whether, in light

of *Gertz,* the Pennsylvania Supreme Court would continue to adhere to the *Rosenbloom* plurality's insistence on a knowing-or-reckless falsity standard in "private figure" cases involving "matters of public or general concern." Two federal district courts have considered this question and arrived at opposing conclusions. *Compare Lorentz v. Westinghouse Elec. Corp.,* 472 F.Supp. 946, 952 (W.D.Pa.1979) (Pennsylvania would adhere to *Rosenbloom*) *with Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406, 411–12 (E.D.Pa.1978) (Pennsylvania would abandon *Rosenbloom* and adopt negligence standard). *See also Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 272 (3d Cir. 1980).

move as far in the direction of protecting private reputation as *Gertz* allows. *Chapadeau, supra,* at 63, 341 N.E.2d at 570. Rather, it held that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover" if he or she can establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Id.* at 64, 341 N.E.2d at 571. As already noted, defendant contends, and plaintiffs do not dispute, that *Chapadeau's* gross irresponsibility standard would apply in this case were New York law to govern. However, neither side takes note of the clauses limiting the application of that standard to matters "arguably within the sphere of legitimate public concern" and "reasonably related to matters warranting public exposition." *Id.* Failing to recite this language, defendant musters no reason why I should conclude that the New York Court of Appeals would find that the defamatory statements alleged here fall within *Chapadeau's* "arguably ... public" subject-matter boundaries.

The New York courts have yet to determine the applicable standard for private figure defamation about matters that are *not* "arguably within the sphere of legitimate public concern." No published article has been held not to be "arguably ... of legitimate public concern."[13] However, all of the reported cases decided under *Chapadeau* thus far have involved reportage in some form, and none that I have uncovered has involved the domain of a private individual's sexual life or any other facet of his or her intimate relations. I am satisfied that the New York Court of Appeals would hold that the defamatory statements alleged here are not—even "arguably"— "within the sphere of legitimate public concern."

I am less certain in prophesying what standard the Court of Appeals would hold applicable in this category of cases. Were I confident that the court would apply what would appear to be the *Gertz* maximum, i.e., a negligence standard, then I might conclude this matter by holding, contrary to the perceptions of the parties, that no conflict exists in this case between New York's and Pennsylvania's libel laws, and that, therefore, Pennsylvania law, as the law of the forum, applies. I am reasonably certain that the Court of Appeals would hold applicable some standard more protective of plaintiffs than *Chapadeau's* gross irresponsibility standard. But, as to *what* standard, I note that in *Chapadeau* the Court chose "to follow a path of its own," embracing neither the *New York Times* standard nor a negligence standard, but one that "falls somewhere between" those two.[14] In light of that, it is conceivable that the court would adopt a second intermediate standard of liability for defamation cases like the one before me, a standard more protective of plaintiffs than the *Chapadeau* standard, but less so than a simple common law negligence standard.

Accordingly, I have chosen to treat this matter as one in which a conflict of laws potentially does exist, and I have found sufficient, for the purpose of disposing of the choice-of-law issue, the tentative conclusions reached above about what would be the controlling New York law.

## II

Because this is a diversity case, selection of the applicable body of substantive law must be made in accordance with the choice-of-law principles which have com-

---

**13.** *See, e.g., Wehringer v. Newman,* 60 A.D.2d 385, 400 N.Y.S.2d 533 (1st Dep't 1978); *Campo Lindo for Dogs, Inc. v. New York Post Corp.,* 65 A.D.2d 650, 409 N.Y.S.2d 453 (3d Dep't 1978); *Cottom v. Meredith Corp.,* 65 A.D.2d 165, 411 N.Y.S.2d 53 (4th Dep't 1978); *Greenberg v. CBS, Inc.,* 69 A.D.2d 693, 419 N.Y.S.2d 988 (2d Dep't 1979); *Karaduman v. Newsday, Inc.,* 51 N.Y.2d 531, 435 N.Y.S.2d 556, 416 N.E.2d 557 (Ct.App.1980).

**14.** Robert D. Sack, *Libel, Slander, and Related Problems* 259 (1980).

mended themselves to the courts of Pennsylvania. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Contemporary choice-of-law doctrine in Pennsylvania emanates from the Pennsylvania Supreme Court's decision in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). *See also McSwain v. McSwain*, 420 Pa. 86, 215 A.2d 677 (1966); *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966); *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970). *Griffith* and its progeny reject the venerable but outmoded *lex loci deliciti*, articulating instead an approach which calls for application of "the law of the state having the most significant contacts or relationships with the particular issue." *Griffith, supra*, 203 A.2d at 802. Under the Pennsylvania approach to choice-of-law problems, what is required in this case is a determination of which state—Pennsylvania or New York—"has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *McSwain, supra*, 215 A.2d at 682.

As I have already noted, plaintiffs advance the argument for Pennsylvania law. They rely on the fact that they are domiciled in Pennsylvania, and maintain that this is where they have suffered injury to their personal and professional reputations, as well as to their business interests and social contacts.[15] In plaintiffs' view, these contacts are significant in light of the policies and interests underlying the law of defamation.

15. *See* Plaintiffs' Deposition at 95–98; 101; 105; 110; 130; and 133–135.

16. See Restatement (Second) Conflict of Laws § 150(2) (1971):
When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.
See also Restatement, *supra*, § 150, Comment e:

■ Defamation laws are undergirded by the state's interest in protecting the individual reputations of its citizens. The interest in reputation has been described as both a property interest—a good reputation is a valuable asset in one's business or profession, *see* Eldredge, *The Law of Defamation* (1978) at 2—and as an interest in preserving the dignity of the individual:

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name

"reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty . . . ." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974), quoting from *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion).

In general, the state of a plaintiff's domicile will be the place where most, if not all, of his or her reputational contacts are found. Accordingly, in the conflict of laws context, the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication.[16]

■ There is no evidence in the record to suggest that plaintiffs' interests in their reputations extend beyond Pennsylvania,[17]

. . . When there has been publication in two or more states . . . at least most issues involving the tort should be determined . . . by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation.

17. Milky Way contends that "the bulk of the injuries complained of in this action . . . were sustained in New Jersey," and that the allegedly defamatory publication concerned activities which would have occurred in New Jersey. Defendant's Memorandum at 5–6. To be sure,

and Pennsylvania jealously guards its citizens' interests in protecting their good names. *Matus v. Triangle Publications, Inc., supra; Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662, 665 (1963). In light of the policies and concerns underlying the law of defamation, I find that Pennsylvania's connection with this litigation is significant. To the extent that plaintiffs, at trial, are able to show injury to reputation and any other of the "customary types of actual harm inflicted by defamatory falsehood," *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 350, 94 S.Ct. at 3012, Pennsylvania would have a substantial interest in providing compensation for such injury.

Milky Way, nonetheless, maintains that, on balance, countervailing policies behind New York's libel law suggest that New York's contacts, as the publisher's home state, are more significant than Pennsylvania's. One can identify two such countervailing policies: (1) protection of a free and uninhibited press to encourage free discussion and debate on matters of public concern; and (2) protection of the home-state publisher's purse or financial integrity. *See*, Note, *The Choice of Law in Multi-State Defamation—A Functional Approach*, 77 Harv.L.Rev. 1463, 1467 (1964). With respect to the first countervailing policy, defendant relies upon the gross irresponsibility standard articulated in *Chapadeau, supra*, as manifesting New York's strong interest in protecting free discussion. Defendant's reliance on *Chapadeau* is misplaced. The standard and policy expressed in that case, although applicable to "private figure" plaintiffs, is, as I have noted, clearly limited to matters "arguably within the legitimate sphere of public concern." *Id.* 379 N.Y.S.2d at 64, 341 N.E.2d at 571. Where the plaintiff is a private figure and

the matter not one of public concern, New York's interest in encouraging free discussion is attenuated, and "the balance between free speech and private reputation," *id.* at 63, 341 N.E.2d at 571, tips in favor of compensating injured plaintiffs. Precisely how far the balance tips in that direction is not a question I must resolve. My determination that the *Chapadeau* standard would not apply in this case supports the conclusion that the policy of protecting free discussion, which that standard is intended to embody and implement, would not be significantly advanced by application of New York's libel law in this case. On this level of policy analysis, New York simply has no significant interest in the outcome of this litigation.

Regarding the second countervailing policy interest, inasmuch as Milky Way is a New York publisher, New York clearly does have a legitimate interest in protecting defendant from any financial injury that might arise from more onerous standards of liability imposed in foreign jurisdictions. In this respect, New York's connection with this litigation is significant. However, I am persuaded by such Pennsylvania Supreme Court decisions as *Matus* and *Purcell v. Westinghouse Broadcasting Co., supra*, that a Pennsylvania court, were it adjudicating this matter, would find this New York contact to be outweighed by Pennsylvania's interest in protecting its citizens' reputations.[18]

Within the matrix of this litigation, then, and in light of the policies underlying the law of private defamation, I find that Pennsylvania, rather than New York, possesses "a priority of interest in the application of its rule of law." *McSwain, supra*, 215 A.2d at 682. It was for this reason that, on December 30, 1981, I entered an

---

these contentions point to contacts with New Jersey. But they are irrelevant to selecting the governing law of defamation. The "injuries complained of . . . in New Jersey" are not injuries to reputation, and I fail to see how Pennsylvania's interest in vindicating plaintiff's good name is attenuated by the fact that the fictive activities would have occurred in New Jersey.

**18.** Whether a New York court would reach the same result in weighing these competing concerns is not a question I must entertain. I note that the Restatement (Second) Conflict of Laws (1971) would appear to support the resolution which I have reached. *See supra*, n.16.

order in this matter directing that Pennsylvania's law shall govern the issue of defendant's liability for defamation.