OPINION OF THE COURT
 

 Levine, J.
 

 Plaintiff Charles Huggins is the former husband of Melba Moore, a popular actress of the musical stage and recording artist, having received a Tony award and two Grammy nominations. Plaintiff brought this defamation action as a result of three articles written by defendant Linda Stasi and published in the “Hot Copy” column of defendant Daily News in 1993. The articles concerned Moore’s allegations of plaintiffs betrayal of trust in their personal and financial relationships during the dissolution of their marriage. The series reported how Moore began to speak out as a self-described victim of “economic spousal abuse,” because she believed her husband had cheated her out of her interest in the entertainment management company they had built together, leaving her destitute.
 

 The issue on this appeal is whether the content of the three articles was arguably a matter of legitimate public concern, thereby imposing upon plaintiff the burden of proving that defendants were “grossly irresponsible” in writing and publishing them, under
 
 Chapadeau v Utica Observer-Dispatch
 
 (38 NY2d 196, 199). We conclude that it was.
 

 Melba Moore married plaintiff in 1976. Huggins acted as her professional and personal financial manager while running Hush Productions, Ltd., a firm that managed a number of other nationally known recording artists.
 

 The first article, published June 11, 1993, recounted why Moore believed she could no longer remain silent about her husband’s fraudulent procurement of an ex parte divorce in another State using forged documents. The article stated that Moore did not even know she was having marital problems when she received a final divorce decree in the mail. She
 
 *300
 
 charged that the surprise divorce was a device for “embezzling [her] out of all of [her] assets.” Moore subsequently commenced a divorce action in New York, which invalidated the out-of-State divorce. Nevertheless, Moore said she was left with an inadequate settlement engineered through plaintiffs manipulation of their financial affairs. Even then, Huggins had only paid a fraction of the settlement, all of which went to defray bills and legal fees. Moore claims she was left with no interest in the management company they had started together, and that plaintiff had blackballed her in the entertainment industry. Thus, Moore found herself penniless and without the means to support herself and their daughter.
 

 The second article, published June 28, 1993, stated that speaking out about the abuse she had endured from her husband had “changed everything” for Moore. She accepted an invitation to address the annual convention of 100 Black Men in Atlanta, at which she told the audience, “ T find myself among an epidemic number of women and children who are victims of the black-on-black crime of economic spousal abuse. * * * I find myself compelled to speak out in earnest against the economic bondage, competitiveness, suppression, repression, oppression and physical, psychological and verbal abuse.’ ” The article described Moore’s plans to continue speaking out by “bring [ing] the issues before Congress to gain support for the Battered Women’s Advocacy Organization.”
 

 On July 9, 1993, one day after Moore had obtained an ex parte temporary order of protection against plaintiff in Family Court, the third article appeared. It reported that Moore had “gotten another order of protection against Huggins, who, she’s told us and a judge, was physically abusive to her.” Moore also claimed that plaintiff continued to subject her to verbal and economic abuse and to do everything he could to ruin her career. She again described her destitution because of Huggins’ misappropriation of the company they founded together.
 

 In an affidavit in support of defendants’ motion for summary judgment, Linda Stasi explained that she wrote the articles because she had believed that “the personal saga [Moore] described, in which she had gone from stardom as a Tony Award winning singer and entertainer to the brink of poverty, would be of great interest to [the newspaper’s] readers.” Stasi “also found her story compelling because it brought to light an important social issue: economic spousal abuse.”
 

 Plaintiff originally commenced this libel action against the Daily News, Stasi and Moore, but Moore was severed from the
 
 *301
 
 action after she filed for bankruptcy. Supreme Court granted summary judgment to the remaining defendants on the ground that the allegedly defamatory statements were constitutionally protected expressions of opinion, rather than assertions of fact. The Appellate Division modified, holding that several of the statements, in effect accusing plaintiff of various criminal acts, were factual and actionable (253 AD2d 297). As to those statements, the Court held that triable issues of fact existed as to whether Stasi and the Daily News were negligent in publishing them.
 

 The Appellate Division rejected defendants’ claim that plaintiff, in order to prevail, was required to meet a standard of gross irresponsibility for the publication of falsehoods in the articles. The Court held that whether statements are a matter of public concern turns “inevitably, on what,
 
 at core,
 
 is being discussed”
 
 (id.,
 
 at 310 [emphasis supplied]). Concluding that the parties’ divorce and the business arrangement incidental thereto were “essentially private affairs”
 
 (id.,
 
 at 310-311), the Appellate Division ruled that no matter of public concern was raised to require proof of a higher standard of fault than negligence. In part, the Court supported its ruling by the holdings of cases that the mere notoriety of a dispute, particularly a divorce, does not turn it into a “public controversy” for constitutionalized defamation purposes
 
 (id.,
 
 at 310, citing
 
 Time, Inc. v Firestone,
 
 424 US 448;
 
 Waldbaum v Fairchild Publs.,
 
 627 F2d 1287;
 
 Krauss v Globe Intl.,
 
 251 AD2d 191).
 

 The Appellate Division granted defendants leave to appeal upon the certified question of whether its order was properly made. Because we conclude that plaintiff must prove that defendants were grossly irresponsible in publishing any untruths injurious to his reputation in the articles in order to prevail in this libel action, we now reverse the order of the Appellate Division, answer the certified question in the negative and remit to Supreme Court for a review of the parties’ submissions and a determination under that standard.
 

 Discussion
 

 In defamation actions against a “public official” or “public figure,” a plaintiff must prove the statement was made with “actual malice,” i.e., with either knowledge that it was false or reckless disregard for the truth
 
 (New York Times Co. v Sullivan,
 
 376 US 254, 279-280;
 
 Curtis Publ. Co. v Butts,
 
 388 US 130, 162). Public figures for constitutionalized defamation purposes include “limited-purpose” public figures, those who
 
 *302
 
 “have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved”
 
 (Gertz v Robert Welch, Inc.,
 
 418 US 323, 345).
 

 Where the defendant is a media publisher or broadcaster and the plaintiff is neither a public official nor a public figure, but the statement involves a matter of public concern, the plaintiff still must prove constitutional malice to recover presumed or punitive damages
 
 (id.,
 
 at 349;
 
 Dun & Bradstreet v Greenmoss Bldrs.,
 
 472 US 749, 761). As for actual damages, however, “so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual”
 
 (Gertz v Robert Welch, Inc., supra,
 
 at 347). Thus, at least with respect to a report on a matter of public concern, private plaintiffs suing media defendants for defamation are constitutionally required to show that the defendants were at fault, but the States are given discretion to require a higher degree of culpability than simple negligence
 
 (see,
 
 2 NY PJI 3:23, at 150-151 [1999 Supp]).
 

 In response to the
 
 Gertz
 
 decision, we held in
 
 Chapadeau v Utica Observer-Dispatch
 
 (38 NY2d 196,
 
 supra)
 
 that a private plaintiff must prove a publisher’s or broadcaster’s gross irresponsibility “where the content of the article is
 
 arguably within the sphere of legitimate public concern,
 
 which is
 
 reasonably related to matters warranting public exposition” (id.,
 
 at 199 [emphasis added]). Thus, when the claimed defamation arguably involves a matter of public concern, a private plaintiff must prove that the media defendant “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties”
 
 (id.).
 

 To make the determination of whether content is arguably within the sphere of legitimate public concern, allegedly defamatory statements “can only be viewed in the context of the writing as a whole, and not as disembodied words, phrases or sentences”
 
 (Gaeta v New York News,
 
 62 NY2d 340, 349). Courts must examine their “ ‘content, form, and context’ ”
 
 (Dun & Bradstreet v Greenmoss Bldrs., supra,
 
 at 761, quoting
 
 Connick v Myers,
 
 461 US 138, 147).
 

 A publication’s subject is not a matter of public concern when it falls “into the realm of mere gossip and prurient interest”
 
 (Weiner v Doubleday & Co.,
 
 74 NY2d 586, 595;
 
 see, Palmisano v Modernismo Publs.,
 
 98 AD2d 953, 954;
 
 Fitzpatrick v Milky
 
 
 *303
 

 Way Prods.,
 
 537 F Supp 165, 170). In addition, publications directed only to a limited, private audience are “matters of purely private concern”
 
 (Dun & Bradstreet v Greenmoss Bldrs., supra,
 
 at 759;
 
 see also, Cottom v Meredith Corp.,
 
 65 AD2d 165, 170;
 
 Connick v Myers, supra,
 
 at 147). Moreover, the fact that the article has been published in a newspaper is not conclusive that its subject matter warrants public exposition
 
 (Gaeta v New York News, supra,
 
 at 349;
 
 see also, Hogan v Herald Co.,
 
 84 AD2d 470, 478-479,
 
 affd for reasons stated below
 
 58 NY2d 630).
 

 Yet we have stated repeatedly that the
 
 Chapadeau
 
 standard is deferential to professional journalistic judgments. Absent clear abuse, the courts will not second-guess editorial decisions as to what constitutes matters of genuine public concern
 
 (Gaeta v New York News, supra,
 
 at 349). This applies equally to the determination whether any particular portion of the text is “reasonably related” to the subject of public concern in the article
 
 (id.).
 
 There is no “abuse of editorial discretion”
 
 (Weiner v Doubleday & Co., supra,
 
 at 595) so long as a published report can be “fairly considered as relating to any matter of political, social, or other concern of the community”
 
 (Connick v Myers, supra,
 
 at 146).
 

 In applying this standard, our cases establish that a matter may be of public concern even though it is a “human interest” portrayal of events in the lives of persons who are not themselves public figures, so long as some theme of legitimate public concern can reasonably be drawn from their experience. Thus, in
 
 Weiner v Doubleday & Co.
 
 (74 NY2d 586,
 
 supra),
 
 a psychiatrist brought a libel action against the publisher of a book which gave an account of the murder of a Salt Lake City multimillionaire. According to that work, the victim’s daughter, who was convicted of planning the murder, had been under the care of the plaintiff, and she “ ‘always slept with her shrinks’ ”
 
 (id.,
 
 at 592). The story of these private individuals was a matter of public concern because it portrayed a larger picture of uncontrolled family pathology, that is, “an inquiry into the failure of a family and professional figures to halt the progression of [the daughter’s] illness before it resulted in murder”
 
 (id.,
 
 at 595). We held in
 
 Weiner
 
 that the gross irresponsibility standard of fault applied because the daughter’s “relationship with plaintiff was not so remote from that subject as to constitute a clear abuse of editorial discretion”
 
 (id.).
 

 Similarly, the telecast in
 
 Cottom v Meredith Corp.
 
 (65 AD2d 165,
 
 supra)
 
 “told the story of one isolated family, but it was a story symptomatic of [a] larger problem”
 
 (id.,
 
 at 171). The news
 
 *304
 
 story depicted the conditions of an elderly couple of limited resources, living in an inadequately heated, crumbling farmhouse, which the plaintiff owner allegedly defaulted in his obligation to maintain
 
 (id.,
 
 at 166-167). Although the broadcast “involved a private legal dispute between a landlord and his tenants,” the Court accepted the editor’s characterization that the story concerned “the health and welfare of elderly citizens living on fixed incomes”
 
 (id.,
 
 at 170). Thus, the
 
 Chapadeau
 
 standard applies to statements about a “private legal dispute,” so long as those statements, in the context of the entire publication, are illustrative of a larger subject of legitimate concern to the public at large.
 

 Again, absent clear abuse, the courts defer to the news editor’s determination of whether the portions of the article to which plaintiff objects are “ ‘reasonably related to matters warranting public exposition’ ”
 
 (Gaeta v New York News, supra,
 
 at 349, quoting
 
 Chapadeau v Utica Observer-Dispatch, supra,
 
 at 199).
 
 Gaeta
 
 involved an article published in the Daily News concerning “a State program for transfer of some 50,000 patients from public mental hospitals into nursing homes, and the subsequent experience of these individuals”
 
 (id.,
 
 at 349). According to the article, one of those patients had “ ‘suffered a nervous breakdown that psychiatrists said was precipitated by a messy divorce and the fact that his son killed himself because his mother dated other men’ ”
 
 (id.,
 
 at 346). This Court held that the defendant was entitled to summary judgment in a libel action by the patient’s ex-wife. We concluded that the causes of the particular patient’s initial confinement, and a chronology of his hospitalization, were “at least arguably a matter of legitimate public interest”
 
 (id.,
 
 at 350). In addition, the statements about the particular patient’s “messy divorce” from the plaintiff were “hardly remote from the subject of the article”
 
 (id.).
 
 This is because, in portraying a matter of public concern, the media are permitted to employ “the familiar journalistic technique of featuring the experiences of a single individual, as exemplifying in human terms the plight of many”
 
 (id.,
 
 at 349-350).
 

 In this case, the Appellate Division’s observation that the interactions of the parties featured in the publications were “private affairs” is no more dispositive than it was in
 
 Weiner, Cottom
 
 or
 
 Gaeta.
 
 Here, the articles themselves show the greater significance of Moore’s personal story, a tragic downfall from a position of stardom and wealth. Moore was given a platform for speaking out as a victim of an allegedly pervasive
 
 *305
 
 modern phenomenon of economic spousal abuse. Manifestly, what Stasi identified as the “important social issue” of “economic spousal abuse” was at least arguably within the sphere of legitimate public concern, triggering the
 
 Chapadeau
 
 standard of journalistic fault.
 

 Moreover, in this case, we will not second-guess Stasi’s editorial determination that Moore’s “personal saga” was reasonably related to this matter of social concern to the community. As we noted in
 
 Gaeta,
 
 although “not conclusive,” the editorial determination of newsworthiness of the subject “ ‘may be powerful evidence of the hold those subjects have on the public’s attention’ ”
 
 (Gaeta v New York News, supra,
 
 at 349, quoting
 
 Cottom v Meredith Corp., supra,
 
 at 170). In this case, the evidence was powerful indeed. The record establishes that Moore’s downfall, and her claim of plaintiffs betrayal, was reported nationwide across the entire spectrum of print and broadcast media.
 

 In ruling to the contrary, the Appellate Division did not accord the deference to editorial judgment our decisions require. That the “core” of the dispute between Moore and plaintiff was a divorce is not conclusive. The articles also portrayed Moore’s alleged victimization by her financial as well as marital partner to the point of economic and career ruination. It is this episode of human interest that reflected a matter of genuine social concern. Like the statements at issue in
 
 Gaeta,
 
 which also in part dealt with that plaintiffs “ ‘messy divorce’ ”
 
 (Gaeta v New York News, supra,
 
 at 346), the allegedly defamatory text here was not so remote from the matter of public concern as to constitute an abuse of editorial discretion
 
 (see, id.,
 
 at 350).
 

 Thus, plaintiff must show that defendants were “grossly irresponsible” in publishing any damaging falsehoods in the articles on Moore’s plight. Since the lower courts did not address whether plaintiffs submissions on the summary judgment motion were sufficient to create a triable issue of fact under that standard, we remit for a determination of that issue
 
 (see, Hogan v Herald Co.,
 
 84 AD2d 470, 476,
 
 affd for reasons stated below
 
 58 NY2d 630,
 
 supra).
 

 Accordingly, the order, insofar as appealed from, should be reversed, with costs, the case remitted to Supreme Court, New York County, for further proceedings in accordance with this opinion, and the certified question answered in the negative.
 

 
 *306
 
 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick, Wesley and Rosenblatt concur.
 

 Order, insofar as appealed from, reversed, etc.