SOUTHRIDGE CAPITAL MANAGEMENT, LLC, Cootes Drive, LLC and York, LLC, Plaintiffs,

v.

Robert W. LOWRY, Samuel Jacob Berkovits and D.G. Jewelry, Inc., Defendants.

No. 01 CIV. 4880(RO).

United States District Court, S.D. New York.

Feb. 25, 2002.

Hillary Richard, Esq., Nina M. Beattie, Esq., Laurie Edelstein, Esq., Brune & Richard, LLP, New York City, for Plaintiffs.

Leslie Trager, Esq., Morley & Trager, New York City, for Defendant Robert W. Lowry.

Lawrence A. Silverman, Esq., Jonathan M. Sperling, Esq., Covington & Burling, New York City, for Defendants Samuel Jacob Berkovits and D.G. Jewelry, Inc.

## OPINION AND ORDER

OWEN, District Judge.

Before me are motions to dismiss this multi-faceted action for damages for defamation, breach of contract, tortious interference with contract, and trade libel, and on jurisdictional grounds, and a motion for sanctions against the plaintiffs.

Plaintiff Southridge Capital Management is an investment adviser to funds that put financing into publicly traded corporations, obtaining their securities and other rights in return. It is the adviser to plaintiffs Cootes Drive, LLC and York, LLC, two such funds. Defendant Robert Lowry earns his living as an expert witness and consultant on securities industry matters. Defendant D.G. Jewelry, Inc. is a publicly traded Ontario corporation that manufactures and sells jewelry, and was being funded by Haymarket, LLC, another Southridge client. Defendant Samuel Berkovits is D.G.'s president, CEO and chairman.

The roots of this dispute date back to the case of *Haymarket LLC v. D.G. Jewelry of Canada Ltd.,* tried in the New York State Supreme Court, New York County in November 2000. In that case, Haymarket, had put money into D.G., got D.G. stock, and thereafter, there being a drop in the market price of the stock, sued D.G.—now also a defendant here—for breach of contract for D.G.'s failure to issue additional shares of its stock to Haymarket as required by their common stock purchase agreement, which stated that D.G. was to issue additional stock to Haymarket if Haymarket did not experience a certain return on its investment. There was no dispute that, under the language of the agreement, D.G. was required to issue these additional shares and that it had refused to do so; its defense being the claim that Haymarket, directed by Southridge [1], had manipulated D.G.'s stock price downward during the operative periods, thereby increasing the number of shares Haymarket was to receive. On November 16, 2000, the jury found that Haymarket had intentionally participated in such a scheme. The court, as it had been foreshadowing all the way through the trial, immediately set the jury verdict aside as unsupported by the evidence and entered judgment for Haymarket, directing the clerk to enter judgment in favor of Haymarket on the issue of liability.

Illustrative of the extensive foreshadowing are the following colloquies from the trial record:

**1.** At the trial, Stephen Hicks, a principal of plaintiff Southridge, here, had testified that Southridge was Haymarket's financial advisor and that he, Hicks, alone directed the trading by Haymarket of D.G.'s stock.

THE COURT: What are you claiming [Haymarket] did wrong here?

MR. REIMER [D.G.'s attorney]: The trades are not carried out by some broker.

THE COURT: What are you claiming they did here, counsel?

MR. REIMER: Your Honor, we are claiming that there were massive sales. Their own principal said -

THE COURT: And they were precluded from doing that by the agreement.

MR. REIMER: There were ten to fifteen percent of the sales when their volume were 10 to 15 percent of the daily sales, it would drive the stock, the company down.

THE COURT: They had a right to do that, absolute right to do that. Counselor, this case may never get to the jury.

MS. RICHARD [Haymarket's attorney]: That—that is my next point, Your Honor.

THE COURT: If I conclude there is no basis for the defense, it is not going to the jury.

*Haymarket* Tr. at 23–24.

THE COURT: Counselor, let's finish this case. If I conclude that there is no evidence that the market makers actions was in any way influenced by anything that [Haymarket] did, I will not give this case to the jury and I will direct the entry of a judgment certainly with respect to the non-liquidated damages and then we can deal with the liquidated damages appropriately.

So this case may not get to the jury. If that is your evidence, counsel, you will not get to the jury.

*Id.* at 245–46.

THE COURT: You're claiming a scheme, presumably participated in by [Haymarket]. And that is your problem in this case, it seems to me, and I think it's an insurmountable problem, but I will let the jury render a verdict. Maybe they will make it unnecessary for me to take any action.

*Id.* at 386.

THE COURT: So you are not waiving that. You want me to state to the jury—no, hear me out here, there is no question the contract was breached. We all agree to that. The only defense they have are equitable. They are not properly tried to the jury.

Counselor, I don't think they have a defense, I already told you that. I have not heard all the witnesses, and we are going to have two depositions and maybe some more expert testimony if the Nasdaq document comes in.

But my sense of this case is that I'm going to give it to the jury only for the purpose, since they are here and have been listening, let them decide on it.

If they make the right decision, I don't have to struggle with it. If they make the wrong decision, I can deal with that. And if I am wrong, at least that aspect of the case doesn't have to be tried again; my view is we will have to deal with damages at some point.

*Id.* at 392–93.

The court charged the jury as follows on this point:

You have to determine whether or not, based on all of the evidence in the case, and you have heard evidence both from the broker, that testimony was read to you, and from the expert witness called by the defendant, there was an improper manipulation.

There is no dispute, obviously, that the market price of the stock went down, but that was a risk that the defendant took under the terms of this agreement. There was nothing in this

agreement that in any way prevented Haymarket from selling the stock as it decided to sell the stock, and, if the manner in which Haymarket sold the stock, based on economic factors, had a negative impact on the price of the stock, that is not anything that Haymarket can be held liable for; that is not improper market manipulation. That was something that was within the terms of the contract.

*Id.* at 527–28.

The jury, thereafter, spoke:

THE COURT: .... Has the jury agreed upon a verdict?

A JUROR: Yes.

THE COURT: With respect to the question: Has the defendant proved that the plaintiff, Haymarket, intentionally participated in [an] improper scheme to manipulate the market, depress [the] price of D.G. Jewelry stock during the two, 30–day reset period.

What was the answer?

A JUROR: Yes

THE COURT: Was that unanimous?

A JUROR: No, it was not.

*Id.* at 535.

And the jury being promptly excused, the following colloquy immediately occurred:

THE COURT: I take it, I'm now talking to the attorney for [Haymarket], you want me to set aside the verdict.

MS. RICHARD: I renew my application.

THE COURT: That motion is granted. And I'm directing the clerk to enter

a judgment on the issue of liability in favor of the plaintiff.

*Id.* at 536.

Directly following the verdict and its immediate vacatur and reversal, D.G. issued a press release, which reads in part:

D.G. Jewelry Wins Jury Verdict Against Haymarket

Judge Directs Verdict for Plaintiff

TORONTO—(BUSINESS WIRE)—Nov. 22, 2000—D.G. Jewelry Inc. (Nasdaq: *DGJL—news* ), which designs, manufacturers, merchandises and distributes stone-set jewelry, today reported that a jury rendered a verdict 8–1 in favor of D.G. Jewelry, in an action brought by Haymarket and that Haymarket was guilty of involvement in a scheme to manipulate the price of D.G. Jewelry shares.

Justice Gammerman of the Commercial Division of the Supreme Court of the State of New York, directed a verdict in favor of the plaintiff, a decision which will be the subject of appeal.

As a result of the decision, its reversal and pending appeal, Justice Gammerman indicated that he would stay any obligations to act on the part of D.G. Jewelry.

Jack Berkovits, CEO of D.G. Jewelry stated: "The jury's verdict confirms our contention at the trial that external forces brought by Haymarket, acting through Southridge Capital and Thomson Kernaghan participated in a scheme to depress the share price of DGJL in the period July 19, 1999 to October 11, 1999."

"We are hopeful and confident that the appellate court will find in our favor as well." [2]

---

**2.** [Footnote by the Court] While it has no relevance to the issues I face today, it is perhaps appropriate to note that on January 17, 2002, the New York State Supreme Court, Appellate Division, First Department in *Hay-*

*market LLC v. D.G. Jewellery of Canada Ltd.,* 736 N.Y.S.2d 356 (1st Dept.2002), affirmed Justice Gammerman, stating, "Accordingly, 'there is simply no valid line of reasoning and permissible inferences which could possibly

Berkovits further stated: "The Company intends to pursue the matter to its ultimate conclusion, including an action for damages against Haymarket and these advisors and affiliates through which we contended at trial. Haymarket conducted its manipulation, including Southridge Capital and Thomson Kernaghan and others."

In D.G.'s release above, I note that D.G. nowhere identifies Haymarket as the plaintiff or D.G. as the defendant. Thus to a lay, or even a legally trained reader, the heading "D.G. Jewelry Wins Jury Verdict Against Haymarket" and the subheading "Judge Directs Verdict for Plaintiff" could be read as both the jury and the judge finding for D.G. Further, the release's language that D.G. was "hopeful and confident that the appellate court will find in our favor *as well*" (underscoring supplied) (omitting to state that it was D.G. that would be appealing) could doubtless reinforce in a reasonable reader's mind that both the judge and the jury had found in D.G.'s favor.

Two further press releases, one from each party, followed over the next month. While a scrutinizing student of all three

releases might be able from the charges and counter-charges to determine what had basically happened, it is for a jury to determine what, if anything, various readers read, studied and parsed out.

But more was to come that a jury here could find revealing of Berkovits' state of mind.[3] On or about January 11, 2001, Berkovits of D.G., following the above, sent an e-mail to a number of companies that Southridge's fund clients were financing under contracts. Following the names and addresses of the companies, the e-mail reads:

It is my understanding that your company completed a private placement financing sometime in 2000 with an entity affiliated with Stephen Hicks and/or Mark Valentine. My company was involved in such a financing in 1999.

My company, as have many others who dealt with these people, subsequently sustained a serious downturn in its stock price, which still continues.

You might find it interesting that in November, 2000, a New York State Supreme Court jury found that D.G. Jewelry Inc. was a victim of stock manipulation conducted through Southridge

---

lead rational [individuals] to the conclusion reached by the jury on the basis of the evidence presented .at trial' (*Cohen v. Hallmark Cards*, 45 N.Y.2d 493, 499, 410 N.Y.S.2d 282, 382 N.E.2d 1145)." *Id.* at 358, 410 N.Y.S.2d 282, 382 N.E.2d 1145 (brackets in the original).

3. During the trial Berkovits' conduct and volatile nature culminated in the trial judge removing him from the trial:

MR. BERKOVITS: Your Honor, you are going to bankrupt my company. This man will testify to manipulation in the stock. Put me away. Because you are killing me anyway. Put me away. The man, this man will testify to manipulation. They are criminals. We are dealing with people who do this for a business and you have an expert here and you are locking us up. You have

not given us a free lunch. You want to break for lunch early today and you have not given us—what is it about this lady. Everything she says-

THE COURT: Take [this] man is [sic] out of the courtroom.

MR. BERKOVITS: I'm out of here.

THE COURT: This man does not come into the courtroom.

MR. BERKOVITS: You are bankrupting me, Your Honor, three hundred families. Somebody committed a crime here. I don't understand. Doesn't that say in God we trust. Look at that, Your Honor. You are bankrupting 300 families.

THE COURT: Take him out of the courtroom, counselor

*Id.* at 299–300, 410 N.Y.S.2d 282, 382 N.E.2d 1145.

Capital and Thomson, Kernaghan. I am attaching copies of press releases resulting from that decision, including the response from Southridge Capital.[4]

I believe that we all have an interest in protecting the integrity of the markets from manipulation and corruption of their free operation. Of necessity, our company has had to learn about the ways in which the markets can be affected in this manner and we have developed information and contacts that assisted us to become enlightened about these kinds of practices. It may be that you too might have similar concerns and might benefit from our experience.

Should you wish to discuss my case, I would be happy to do so, within the bounds of confidentiality requirements and legal restrictions.

Yours very truly,

Samuel Jacob Berkovits, President, CEO

D.G. Jewelry, Inc. Tel: (416) 665–8844, ext. 222 [5]

Thereafter, following a tense exchange between lawyers for both sides, on or about February 23, 2001, Berkovits sent to the recipients of the above e-mail, the following:

I write to clarify some of the comments contained in my letter to you of January 11, 2001. Although the press releases attached to my letter make clear the following, I wanted to make sure that my letter was not misinterpreted. The trial that I mentioned was a case brought by Haymarket against D.G. Jewelry for breach of contract. The jury returned a verdict against Haymarket LLC, not Southridge Capital,

Thomson Kernaghan, Steve Hicks or Mark Valentine. Although D.G. Jewelry argued at the trial that the stock manipulation scheme we contended Haymarket had participated in also involved Southridge Capital and Thomson Kernaghan, the jury was only asked to make a determination regarding Haymarket.

The court immediately overturned the jury's verdict against Haymarket and instead entered judgment for Haymarket, ordering D.G. Jewelry to issue 316,-933 shares of its common stock to Haymarket. D.G. Jewelry is in the process of appealing that decision. After D.G. Jewelry posted a bond, Justice Gammerman stayed any obligation to act on the part of D.G. Jewelry pending the appeal.

I want to stress that I am not suggesting that your company should in any way attempt to avoid any valid contractual obligations that it may have with any entities affiliated with Southridge Capital, Thomson Kernaghan, or Messrs. Hicks or Valentine, and I want to be sure that you have not drawn any such suggestion or implication from my earlier communication with you.

Yours very truly,

Samuel Jacob Berkovits, President, CEO—

D.G. Jewelry, Inc. Tel: (416) 665–8844, ext. 222

█ Southridge in its complaint presently before me now alleges that because of D.G.'s conduct above it is now a defendant in two other actions, and two of its funding clients, Cootes and York, have had their funding contracts with Internet Law Library and Mobile P.E.T. Systems, Inc.

---

4. [Footnote by the Court] Southridge, not a party, had made no response.

5. [Footnote by the Court] Berkovits also, the complaint alleges, telephoned one of the e-mail recipients, specifically the CEO of Internet Law Library, urging him to break his contract with Cootes, Southridge's client, which he did.

respectively broken to everyone's damage. Thus, whatever a jury might draw from any other evidence in this case, the foregoing requires that the plaintiffs' allegations against Berkovits and D.G., of defamation and sequelae (*see* p. 1, *supra*) including punitive damages, go to the jury. Accordingly, the motion by D.G. and Berkovits to dismiss is without merit and is denied. *See Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001); *Armstrong v. Simon & Schuster, Inc.,* 85 N.Y.2d 373, 625 N.Y.S.2d 477, 481, 649 N.E.2d 825 (1995); *Davis v. Ross,* 754 F.2d 80, 82 (2d Cir.1985); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 177–78 (2d Cir.2000); *Immuno A.G. v. Moor–Jankowski,* 145 A.D.2d 114, 537 N.Y.S.2d 129, 135 (1st Dept.1989); *Huggins v. Moore,* 94 N.Y.2d 296, 704 N.Y.S.2d 904, 908, 726 N.E.2d 456 (N.Y.1999).

Given the foregoing, D.G.'s and Berkovits' motion for Rule 11 sanctions has no support and is also denied.

Turning to defendant Lowry's motions, Lowry had testified at the said *Haymarket* trial as an expert witness for D.G. In connection with this engagement, he signed an employment agreement with D.G.'s counsel, Kirkland & Ellis, which included the following:

> You agree that documents and information of any kind that you…acquire will be maintained in strict confidence and not disclosed to any other person or party without our prior written consent. All documentary material provided to you…together with all copies thereof must be returned immediately upon request. In addition, any activities that you perform under this agreement and any conclusions or judgments that you reach or have reached must be maintained as confidential in the same way. You should understand that these restrictions will continue even after the termination of your consulting work for

us and after the termination of the matter.

Southridge contends that this paragraph was included in the agreement for its protection as part of a prior agreement with Kirkland & Ellis to maintain the confidentiality of certain confidential and proprietary business information that had been revealed as part of the *Haymarket* litigation.

After the *Haymarket* case concluded, Lowry was retained by an attorney for a San Diego, California corporation, Mobile P.E.T. Systems, Inc., which was in a dispute with plaintiff York, a plaintiff in this case, and another Southridge client. In that connection, Lowry faxed from his home in Virginia to Mobile P.E.T. in California a chart that he had helped to prepare as part of the *Haymarket* litigation showing the relationships between Southridge and other companies (York is not mentioned in the chart). Southridge contends that this chart was based on confidential information, documents and testimony that it had provided to Kirkland & Ellis during the *Haymarket* litigation and was within the confidentiality protection of the agreement signed by Lowry. Plaintiffs here also allege that Lowry made statements to Mobile P.E.T. concerning Southridge in violation of the agreement and for the purpose of causing Mobile P.E.T. to breach its contract with York, and that as a result of these, Mobile P.E.T. did breach its contract with York, refusing to deliver to York certain Mobile P.E.T. common stock and refusing to convert certain Mobile P.E.T. common stock to preferred stock as demanded by York. York sues for damages for the foregoing, and Southridge sues for breach of the confidentiality agreement, which is part of Mobile P.E.T.'s separate suit against it.

Defendant Lowry moves to dismiss for lack of personal jurisdiction pursuant to

Fed.R.Civ.P. 12(b)(2) claiming: (1) that personal jurisdiction does not exist because, under New York's long arm statute (CPLR § 302(a)(1)), the claims do not arise out of a New York transaction; and (2) that plaintiff Southridge is not a third party beneficiary of the agreement between Lowry and Kirkland & Ellis. I address the second allegation first.

■■■ "The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss.... A plaintiff may carry this burden by pleading in good faith...legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction.... [A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir.2001) (internal citations omitted).

■■■ Under New York law, a third party may enforce a contract if it is within the class of intended beneficiaries of the contract even if not named or known of at the time. *See Trans–Orient Marine v. Star Trading & Marine*, 925 F.2d 566, 573 (2d Cir.1991). "In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement.... [T]he obligation to perform to the third party beneficiary need not be expressly stated in the contract." *Id.* "An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance." *Id.*

Looking at the facts in a light most favorable to Southridge, Southridge alleges a viable claim to a third party beneficiary status. Southridge alleges a prior agreement with D.G.'s counsel—the promisee of the agreement with Lowry—to keep confidential information learned through the *Haymarket* litigation, and that the promisee intended that one in the position of Southridge be a beneficiary of the agreement made with Lowry.

■■■ Turning to the issue of jurisdiction, "[i]n assessing whether personal jurisdiction is authorized, the court must look first to the long-arm statute of the forum state.... If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process." *Whitaker*, 261 F.3d at 208 (internal citations omitted). To come within New York's long-arm statute under CPLR § 302(a)(1), Lowry must have engaged in purposeful activities within New York, and there must be a substantial relationship between those activities and the transaction out of which the cause of action arose. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir.1997). Substantial relationship can be shown where an action "is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business." *Id.*

It is undisputed that Lowry transacted business in New York by signing the contract with D.G.'s counsel, assisting here in D.G.'s suit and testifying here on behalf of D.G. It is also undisputed that Lowry faxed information he received during that suit to Mobile P.E.T. Since the cause of action by Southridge is sufficiently related to the business Lowry transacted in New York, it confers personal jurisdiction. Accordingly, Southridge has made a prima facie showing that it is a third party beneficiary of the confidentiality contract signed by Lowry in New York; therefore,

its claim for the breach of that contract confers personal jurisdiction.

I now turn to the issue of whether there exists personal jurisdiction for the claim by York that Lowry by breach of the confidentiality agreement, and statements Lowry made to Mobile P.E.T. in addition, tortiously interfered with and caused the breach of York's contract with Mobile P.E.T. "There is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury.... It is sufficient if the cause of action is related to and grows out of the transaction of business in New York." *Legros v. Irving,* 38 A.D.2d 53, 327 N.Y.S.2d 371, 373–74 (1st Dept.1971), *appeal dismissed,* 30 N.Y.2d 653, 331 N.Y.S.2d 673, 282 N.E.2d 626 (1972). While York was not a beneficiary of the contract signed by Lowry, the information allegedly used by Lowry to tortiously interfere with York's contract with Mobile P.E.T. was gained from and flowed to Lowry from his business activity in New York. Therefore, there is personal jurisdiction for this cause of action.

As to whether the exercise of jurisdiction comports with the requisites of due process, it only "requires that a defendant have enough minimum contacts with the forum state so that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.... We may exercise jurisdiction over [the defendant] if we find that he has purposely and sufficiently availed himself of the privileges of conducting business in New York so as to reasonably expect to be subject to suit here." *PDK Labs,* 103 F.3d at 1110–11 (internal citations omitted). By his employment as an expert in the New York *Haymarket* suit, testifying here on behalf of D.G., and obtaining from that New York suit material information used and allegedly abused thereafter, Lowry has sufficient-

ly availed himself of the privilege of conducting business in New York and should have reasonably expected to be subject to suit here. Therefore, the due process requirement is satisfied, and Lowry's motions to dismiss are denied.

So ordered.