# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 6, 2024 Session

## LEIBY GOLDBERGER ET AL. v. THOMAS J. SCOTT ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 22-1256-BC      Anne C. Martin, Chancellor**

———————————————————

### No. M2022-01772-COA-R3-CV

———————————————————

This is an appeal from the denial of a petition to dismiss under the Tennessee Public Participation Act ("TPPA"), Tenn. Code Ann. §§ 20-17-101 to -110. The defendant-petitioner asserted that this action was filed by the plaintiffs in response to his "exercise of the right of free speech," which the TPPA defines as "communication made in connection with a matter of public concern." Specifically, the defendant-petitioner asserted that he was exercising his right of free speech regarding a matter of public concern when he made public the plaintiffs' failure to disclose their involvement in prior franchise litigation and regulatory actions as required by franchising laws. The trial court denied the petition, finding that the TPPA did not apply because the claims did not involve issues or matters of public concern and free speech as referenced in the TPPA. This appeal followed. We respectfully disagree with this finding. We conclude that the defendant-petitioner presented prima facie evidence that the plaintiffs commenced this action in response to the defendant-petitioner's exercise of free speech on a matter of public concern related to goods, products, or services in the marketplace. Specifically, the defendant-petitioner's public dissemination of information via a website alleging that the plaintiffs were continuing to market franchises while withholding material information required to be disclosed by the Federal Trade Commission Franchise Rule. *See* 16 C.F.R. pt. 436. Accordingly, we reverse the judgment of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Roland W. Baggot III, Nashville, Tennessee, and Paul W. Moser, Brentwood, Tennessee, for the appellant, Thomas J. Scott.

Charles Michels, Nashville, Tennessee, for the appellees, Lieby Goldberger, Curt Swanson, and Home Based Franchise Group, LLC.

## OPINION

### FACTS AND PROCEDURAL HISTORY

Between October 2020 and June 2021, Lieby Goldberger and Thomas J. Scott formed four companies: Dryer Vent Squad Franchising, LLC; Frost Shades Franchising, LLC; Magnetainment Franchising, LLC; and Clozetivity Franchising, LLC (collectively, "the Franchising Entities"). A short time later, a third investor—Curt Swanson—joined as an equal member of each company. Mr. Goldberger, Mr. Scott, and Mr. Swanson then formed Home Based Franchise Group, LLC ("HBFG"), to serve as an "umbrella" company for the Franchise Entities.[1]

All five companies were formed in Tennessee, and all five were to be member-managed, but only HBFG had an operating agreement, denominated as its "Stockholders Agreement." The Stockholders Agreement named Mr. Goldberger, Mr. Scott, and Mr. Swanson as the company's "shareholders," "directors," and "officers," with equal authority to conduct all business matters.

Mr. Scott was also the sole owner of a separate company, Brand Journalists, LLC, which provided IT and marketing services to HBFG and the Franchise Entities. Mr. Scott's daughter, Sophia Giordano-Scott, worked as a content marketing manager for Brand Journalists, and she owned a Dryer Vent Squad franchise in Louisiana. Mr. Scott's wife, Angie Scott, owned a Clozetivity franchise in Tennessee.

When Mr. Scott agreed to go into business with Mr. Goldberger and Mr. Swanson, he was purportedly unaware that both men were or had been defendants in two civil actions involving another franchisor, Patch Boys Franchising, LLC. *See*, *e.g.*, *Anderson v. Patch Boys Franchising, LLC*, No. 0:19-ev-03119 (D. Minn. Dec. 19, 2019). Mr. Scott was also purportedly unaware that Patch Boys had settled two state regulatory actions arising out of Mr. Goldberger's failure to comply with state franchise law. *See, e.g.*, *In re Patch Boys Franchising*, No. 54957 (Minn. Dept. of Commerce June 30, 2021). Mr. Scott claims to have discovered these and other undisclosed legal matters in June 2022.

Shortly thereafter, Brand Journalists stopped providing services to HBFG and the Franchise Entities because of a payment dispute. The cessation of Brand Journalist's services allegedly caused a disruption to the Franchise Entities' operations. Mr. Goldberger and Mr. Swanson then voted to "remove" Mr. Scott from the management of the Franchise Entities and HBFG.

---

[1] The parties dispute the exact nature of the relationship between HBFG and the Franchise Entities, but they agree that HBFG was to provide centralized administrative services to the Franchise Entities.

Then, in August 2022, Mr. Scott sued Mr. Goldberger and Mr. Swanson for conversion, defamation and false light invasion of privacy, civil conspiracy, and breach of their duties under the Tennessee Revised Limited Liability Act. *See Goldberger v. Swanson*, No. 22-1140-I (Ch. Ct., Davidson Cnty., Tenn., Aug. 24, 2022), *removed to* No. 3:22-CV-00763 (M.D. Tenn. Sept. 29, 2022). According to Mr. Scott's complaint, Mr. Goldberger and Mr. Swanson caused the Franchise Entities to violate a federal regulation that requires all franchisors to disclose the litigation histories of their principals. Mr. Scott alleged that Mr. Goldberger and Mr. Swanson knew about this requirement but concealed the Patch Boy litigation during the preparation of Federal Disclosure Documents ("FDDs") for the Franchise Entities. Mr. Scott also alleged that Mr. Goldberger violated federal regulations by making oral financial performance representations to prospective franchisees without including those representations in writing.

Meanwhile, Mr. Scott, Mrs. Scott, and Ms. Giordano-Scott allegedly contacted several franchise owners to tell them about the lawsuit against Mr. Goldberger and Mr. Swanson. Furthermore, Mr. Scott disseminated his allegations of ongoing franchising improprieties by posting his complaint on the Brand Journalists' website. In turn, Mr. Goldberger and Mr. Swanson contacted the franchise owners and made various allegations against Mr. Scott.

Less than a month later, Mr. Goldberger, Mr. Swanson, and HBFG ("Plaintiffs") commenced this action against Mr. Scott, Mrs. Scott, Ms. Giordano-Scott, and Brand Journalists. Plaintiffs alleged, *inter alia*, that Mr. Scott damaged HBFG and the Franchise Entities by engaging in "wide-ranging activities," including:

    a. Telling others that Mr. Swanson and Mr. Goldberg do not know how to run a business;

    b. Interfering with the Frost Shades Intranet to the point that it is non-operational;

    c. Cutting off HBFG's and the Franchise Entities' access to the resources and websites they purchased from Mr. Scott's company, Brand Journalists;

    d. Cutting off access by Mr. Swanson and Mr. Goldberg to HBFG's CallRail system, a call management system, as well as using it without the approval of Plaintiffs;

    e. Publicly disparaging Plaintiffs by posting [a link to Mr. Scott's complaint] on Brand Journalists' website . . . ;

    f. Contacting many franchisees to distribute false and defamatory information about HBFG, Mr. Swanson and Mr. Goldberg and

encouraging them to cancel their franchise agreements and withhold payment of franchise royalties, and offered referrals to legal counsel for such purpose;

g. Offering assistance to a direct competitor's business; and

h. Creating materials for Plaintiffs that have been kept in the possession of Defendants, including Brand Journalists.

Based on these and other allegations, Plaintiffs asserted claims against Mr. Scott for business disparagement; tortious interference with business relationships; breach of contract; breach of the duty of loyalty; and breach of the duty of care. Plaintiffs also asserted claims against Brand Journalists, Ms. Giordano-Scott, and Mrs. Scott for "aiding and abetting" Mr. Scott's alleged breaches.

Plaintiffs then moved for a temporary injunction to prevent Mr. Scott from (a) "directly or indirectly disparaging or defaming Plaintiffs, including to their clients and contacts"; (b) "directly or indirectly interfering with Plaintiffs' business relationships and goodwill, including interfering with operations and property of Plaintiffs"; and (c) "directly or indirectly assisting or offering to assist Plaintiffs' competitors."

Mr. Scott then filed a timely petition to dismiss the action under the TPPA, Tennessee Code Annotated §§ 20-17-101 to -110. Referencing the statute's requirements, Mr. Scott asserted that Plaintiffs commenced the action "in response to" his "exercise of the right of free speech," which the TPPA defines as "communication made in connection with a matter of public concern." *See* Tenn. Code Ann. § 20-17-103(3).

After Mr. Scott filed his petition, Plaintiffs voluntarily dismissed their claims against Mrs. Scott, Ms. Giordano-Scott, and Brand Journalists. They also dismissed their claims against Mr. Scott for business disparagement, tortious interference with business relations, and inducement of breach of contract. Thus, the only remaining claims against Mr. Scott were for breach of contract and his duties of loyalty and care. Plaintiffs therefore argued that the TPPA was inapplicable because the remaining claims were "directed towards a former business partner" and related to a private dispute. The trial court agreed and ruled from the bench as follows:

[T]he TPPA is not applicable to this dispute and the claims that are brought, that this lawsuit does not involve issues that make the TPPA applicable. And, specifically, the Court does not find that these involve issues of matters of public concern and exercises of their right of free speech, as referenced in the TPPA.

This appeal followed.

- 4 -

The dispositive issue is whether Mr. Scott's allegations of fraudulent concealment against Mr. Goldberger and Mr. Swanson were "made in connection with a matter of public concern" as required by the TPPA.[2] *See* Tenn. Code Ann. § 20-17-103(3).

## STANDARD OF REVIEW

The TPPA requires petitioners to make "a prima facie case" that the statute applies. *See* Tenn. Code Ann. 20-17-105(a). Whether a party has made a prima facie case is a question of law. *See Macon Cnty. v. Dixon*, 100 S.W.2d 5, 9 (Tenn. Ct. App. 1936) (describing "prima facie evidence" as evidence that, "in judgment of law, is sufficient to establish the fact"); *accord Lee v. Mitchell*, No. M2022-00088-COA-R3-CV, 2023 WL 5286117, at *6 (Tenn. Ct. App. Aug. 17, 2023). We review a trial court's decision on questions of law *de novo* with no presumption of correctness. *See Ultsch v. HTI Mem'l Hosp. Corp.*, 674 S.W.3d 851, 860 (Tenn. 2023).

To the extent that this case also requires that we construe the TPPA, our review is similarly de novo with no presumption of correctness. *See Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 657 (Tenn. Ct. App. 2021). As we have explained, "We begin by 'reading the words of the statutes using their plain and ordinary meaning in the context in which the words appear.' When the language is clear and unambiguous, we look no further than the language of the statute itself to determine its meaning." *Id.* (citations omitted) (quoting *Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 30 (Tenn. Ct. App. 2018)).

## ANALYSIS

The stated purpose of the TPPA is "to encourage and safeguard the constitutional rights of persons . . . to speak freely . . . and, at the same time, protect the rights of persons to file meritorious lawsuits for demonstrable injury." Tenn. Code Ann. § 20-17-102. It is

---

[2] Mr. Scott's appellate brief states the issue as follows:

Did the [trial court] err when it refused, by Order entered December 14, 2022, to dismiss the plaintiffs' legal action pursuant to a petition filed by Defendant-Appellant Thomas J. Scott under TCA § 20-17-101 *et seq.* after Appellant sought to disclose Appellee's acts of fraud and failure to disclose federally required information to customers who had signed unlawfully procured franchise agreements and Appellees filed a lawsuit against Appellant seeking to restrain his constitutionally protected free speech.

also significant to note that the TPPA "shall be construed broadly to effectuate its purposes and intent." *Id.*

The TPPA provides that, **"[i]f a legal action is filed in response to a party's exercise of the right of free speech**, . . . that party may petition the court to dismiss the legal action." *Id.* § 20-17-104(a) (emphasis added).[3] The exercise of the right of free speech is defined as "a communication made in connection with a matter of public concern or religious expression that falls within the protection of the United States Constitution or the Tennessee Constitution." *Id.* § 20-17-103(3).

As this court recently explained in *Garner v. Thomason, Hendrix, Harvey, Johnson & Mitchell, PLLC*, No. W2022-01636-COA-R3-CV, 2024 WL 1618897 (Tenn. Ct. App. Apr. 15, 2024):

> If the petitioning party meets their burden to "make a prima facie case that a legal action against the petitioning party is based on, relates to, or is in response to that party's exercise of the right of free speech, . . ." then "the court shall dismiss the legal action unless the responding party establishes a prima facie case for each essential element of the claim in the legal action." Tenn. Code Ann. § 20-17-105(a), (b). Additionally, "the court shall dismiss the legal action if the petitioning party establishes a valid defense to the claims in the legal action." Tenn. Code Ann. § 20-17-105(c). When considering a petition filed under the TPPA, the court may consider "supporting and opposing sworn affidavits stating admissible evidence upon which the liability or defense is based and on other admissible evidence presented by the parties." Tenn. Code Ann. § 20-17-105(d). If an action is dismissed based on a TPPA petition, the court "shall award to the petitioning party . . . [c]ourt costs, reasonable attorney's fees, discretionary costs, and other expenses" and other relief "necessary to deter repetition of the conduct by the party who brought the legal action or by others similarly situated." Tenn. Code Ann. § 20-17-107(a). If, however, the court finds that the petition was frivolous or filed solely for purposes of delay, the court may award costs and reasonable attorney's fees to the party opposing the TPPA petition. Tenn. Code Ann. § 20-17-107(b).

*Id.* at *6.

---

[3] The TPPA also applies to actions filed in response to the petitioner's exercise of the right to petition and the right to association. *See* Tenn. Code Ann. § 20-17-104(a). In the argument section of his brief, Mr. Scott contends that this suit also implicates his "right to petition." But we find this issue waived. Mr. Scott's TPPA petition was based solely on his purported "exercise of the right of free speech," and Mr. Scott's issue statement on appeal is similarly limited. *See*, *supra*, n.2.

Thus, as an initial matter, Mr. Scott had to make a prima facie case that Plaintiffs' complaint was based on, related to, or filed in response to his "communication made in connection with a matter of public concern . . . that falls within the protection of the United States Constitution or the Tennessee Constitution." *See* Tenn. Code Ann. § 20-17-105(a).

Our Supreme Court has recently explained,

> To establish a "prima facie" case under the TPPA, a party must present enough evidence to allow the jury to rule in his favor on that issue. This evidence may include "sworn affidavits stating admissible evidence" and "other admissible evidence." Tenn. Code Ann. § 20-17-105(d). As is the case when a court rules on a motion for summary judgment or motion for directed verdict, the court should view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence. *See, e.g.*, *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005) (summary judgment); *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (directed verdict).

*Charles v. McQueen*, ____ S.W.3d ____, No. M2021-00878-SC-R11-CV, 2024 WL 3286527, at *13, (Tenn. July 3, 2024).

The TPPA does not define "matter of public concern" so much as provide a list of examples, including "[a]ny matter deemed by a court to involve a matter of public concern." Tenn. Code Ann. § 20-17-103(6). Specifically, the TPPA states that a "matter of public concern" includes issues "related to":

(A)     Health or safety;

(B)     Environmental, economic, or community well-being;

(C)     The government;

(D)     A public official or public figure;

(E)     *A good, product, or service in the marketplace*;

(F)     A literary, musical, artistic, political, theatrical, or audiovisual work; or

(G)     Any other matter deemed by a court to involve a matter of public concern.

*Id.* (emphasis added). Thus, the statute defines "matter of public concern" as including an issue "related to" a good, product, or service in the marketplace. *Relate*, *Webster's New*

- 7 -

*World College Dictionary* (5th ed. 2014) (defining "relate" as, *inter alia*, "having to do with").

Moreover, when interpreting a statute, we presume that established phrases such as "matter of public concern" keep their common law meaning. *See Seals v. H & F, Inc.*, 301 S.W.3d 237, 251 (Tenn. 2010) (holding "heir" retained "its ordinary meaning" when undefined in statute); 2B Sutherland Statutory Construction § 50:1 (7th ed.) ("All legislation is interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment."). Pertinent here, "matter of public concern" is a well-established category of protected speech in First Amendment jurisprudence. *See*, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)). We presume the legislature was aware of this when it enacted the TPPA in 2019.

In *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270 (Tenn. Ct. App. 2007), we explained the meaning of "matters of public concern" as follows:

> Matters of public concern have "been characterized as those matters as to which 'free and open debate is vital to informed decision-making electorate.'" Matters of public concern are "of political, social, or other concern to the community." Located across a disputed and poorly marked border, matters of private concern tend to "fall[] into the realm of mere gossip and prurient interest." They represent an intrusion into the sanctity of private life. Information that is merely of private concern does not, however, have to be of an intimate nature. Rather, it may simply be confidential information that does not add to public discussion or debate on societal questions.

*Id.* at 297 (citations omitted) (first quoting *Phillips v. State Bd. of Regents of State Univ. & Cmty. Coll. Sys. of State of Tenn.*, 863 S.W.2d 45, 51 (Tenn. 1993); then quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983); then quoting *Huggins v. Moore*, 726 N.E.2d 456, 460 (N.Y. 1999)).

Here, Mr. Scott is alleged to have disseminated false and damaging information concerning Plaintiffs' history in the franchise industry, including Plaintiffs' failure to disclose previous franchise litigation as well as regulatory actions in two states, not only by direct communications with their franchisees but also by posting such information on a business website.

While Plaintiffs contend in their appellate brief that Mr. Scott's communications "only implicate private, existing business relationships, not a matter of public concern," the allegations in their complaint tell a different story. Plaintiffs alleged, in pertinent part, as follows:

29. In or around December of 2021, Mr. Goldberg and Mr. Swanson learned that Defendants had engaged in wide-ranging activities that have damaged HBFG and the Franchise Entities. These activities have resulted in significant injuries to the business of Plaintiffs, **including the loss of franchise opportunities, damage to the reputations of the business and its management team, and the loss of credibility in the franchise industry**.

.    .    .    .    .

33. . . . After his removal as Chief Operating Officer, **Mr. Scott . . . engaged in a series of targeted attacks** against HBFFG and the Franchise Entities, **including through Brand Journalists**. **The Defendants' attacks include**, but are not limited to, the following:

    a.  Telling others that Mr. Swanson and Mr. Goldberg do not know how to run a business;

.    .    .    .    .

    e.  **Publicly disparaging Plaintiff by posting the following link on Brand Journalists' website; (https://brandjournalists.com/leo-goldberger-curt-swanson-sued for-franchise-fraud/)**;

.    .    .    .    .

34. There is no justification for the Defendants' actions. **Their wrongdoing has** already caused Plaintiffs to lose business, diverted business away from HBFG, and **irreparably damaged Plaintiffs' reputation in the marketplace**. The imminent threat of further such irreparable harm and damage remains. . . .

.    .    .    .    .

55.    Defendants have unlawfully disparaged Plaintiffs through **false statements made to third parties** regarding the condition or character of Plaintiffs' operations.

(Emphasis added).

From reading the complaint, it is apparent that Plaintiffs are complaining about Mr. Scott's communications with persons other than Plaintiffs' existing customers, including the posting on Brand Journalists' website.

The regulation of franchises and compliance with franchise regulations is certainly a matter of public concern. As one of our federal counterparts recently explained, these regulations were put in place to protect franchisees:

> Franchising, like many industries, provides opportunities for bad actors to take advantage of unsophisticated counterparties—for example, by luring prospective franchisees into paying exorbitant fees to open franchises with little or no chance of actual success. In light of those risks, "[o]n November 11, 1971, the [Federal Trade Commission ('FTC')] announced the initiation of a proceeding for the promulgation of a trade regulation rule relating to disclosure requirements and prohibitions concerning franchising," which ultimately culminated in the final issuance of that agency's "Franchise Rule" several years later. 43 Fed. Reg. 59614, at 59,622. The Franchise Rule "requires franchisors to furnish prospective franchisees with disclosure documents"—commonly known as the company's "FDD"—"at least 14 calendar days before the prospective franchisee signs the franchise agreement." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 835 (5th Cir. 2021) (citing 16 C.F.R. § 436.2(a)). An FDD must contain certain required information about the franchisor and the business being franchised, *see* 16 C.F.R. § 436.5, and "[a]ll information in the disclosure document" must "be current as of the close of the franchisor's most recent fiscal year." 16 C.F.R. § 436.7(a).

*Lunt v. Frost Shades Franchising, LLC*, No. 3:22-CV-00775, 2023 WL 3484202, at *2 (M.D. Tenn. May 16, 2023).

Significantly, the TPPA did not require Mr. Scott's **communication** to be of public concern or even to be **about** a matter of public concern—the statute required his communication to be only "made **in connection with**" "an issue **related to**" any "matter deemed by a court **to involve** a matter of public concern." Tenn. Code Ann. §§ 20-17-104, -103(3), (6) (emphasis added); *see also Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 581 (D.C. 2022) (construing identical language and holding that "a given statement need only 'relate' (rather than expressly refer to) one of the above topics to fall within the Act's protections" (citation omitted)).

Plaintiffs also argue that the TPPA does not apply because Mr. Scott "seeks to vindicate his own interests." But the TPPA contains no intent requirement for communication to be an "exercise of the right of free speech." *Compare* Tenn. Code Ann. § 20-13-103(3) (limiting "exercise of the right of free speech" to issues of "public concern" without an intent requirement) *with id.* § 20-13-103(4) (limiting "exercise of the right to petition" to communication that is intended to elicit governmental review of "an issue" without a "public concern" requirement); *see also Doe v. Roe*, 638 S.W.3d 614, 619 (Tenn. Ct. App. 2021) (concluding that communication need not involve "the greater good or [an] attempt to raise awareness in the community as a whole"); *Doe v. Kansas State Univ.*, 499

P.3d 1136, 1147 (Kan. Ct. App. 2021) (construing identical statute and noting that the definition of "matter of public concern" does not address "the motive or merits of a communication").

Given the TPPA's broad language, as well as the legislature's directive to construe the statute's language "broadly to effectuate its purposes and intent," Tenn. Code Ann. § 20-17-102, we conclude that Mr. Scott made a prima facie case that his communications fell within the statute's scope. Mr. Scott's communications were not restricted to private, existing business relationships but were also published over the internet and were made in connection with an issue related to the regulation of franchisors, which is a matter of public concern. *See Pryor v. Brignole*, 292 A.3d 701, 706 (Conn. 2023) (observing that allegations of unethical behavior by a regulated professional would fall under identical statute as would any "allegation of illegal behavior").

We also note that after Mr. Scott filed his TPPA petition, Plaintiffs dismissed all their claims except for those against Mr. Scott for breach of contract and his duties of loyalty and care. Based upon this fact, Plaintiffs contend that the TPPA is inapplicable because the remaining claims were "directed towards a former business partner" and related to a private dispute. We find that Plaintiffs misconstrue the purpose and scope of the TPPA.

The TPPA is an "anti-SLAPP" statute, meaning that it was enacted to protect persons from "strategic lawsuits against public participation." *See Nandigam Neurology, PLC*, 639 S.W.3d at 657. "SLAPPs use the threat of money damages or the prospect of the cost of defending against the suits to silence citizen participation." *Id.* (quoting *Sandholm v. Kuecker*, 962 N.E.2d 418, 427 (Ill. 2012)). Thus, as we explained in *Garner*, "'the plaintiff's choice of what cause of action to plead matters little' in determining whether the TPPA applies." 2024 WL 1618897 at *7 (quoting *Nandigam Neurology*, 639 S.W.3d at 658)). While the communication at issue in *Garner* involved the right to petition, as opposed to the right of free speech that is at issue here, the legal consequence is the same. *See also* Rodney A. Smolla, 2 Law of Defamation § 9:107 (2d ed.) ("Considering the purpose of the anti-SLAPP law, the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain rights.").

Thus, in this case it matters not that Plaintiffs have limited their claims to a private dispute directed towards a former business partner. *See Garner*, 2024 WL 1618897, at *7.

For the foregoing reasons, we hold that Mr. Scott established a prima facie case by showing that Plaintiffs' filed suit against him in response to his exercising his right of free speech in relation to a matter of public concern.

Because the trial court denied Mr. Scott's petition on the basis that Mr. Scott had not met the first step of the TPPA burden-shifting framework, we remand this case to the trial court for further proceedings, including consideration of whether Plaintiffs met their

prima facia burden and, if so, whether Mr. Scott nonetheless established a valid defense. *See* Tenn. Code Ann. § 20-17-105.

## IN CONCLUSION

The trial court's judgment is reversed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellees, Lieby Goldberger, Curt Swanson, and Home Based Franchise Group, LLC.

_____
FRANK G. CLEMENT JR., P.J., M.S.